**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE,

Plaintiff,

v.

PACIFIC BELL TELEPHONE COMPANY,

Defendant.

C.A. No. 2:21-cv-00073 (E.D. Cal.)

Case: 1:23−mc−00125
Assigned To : Kelly, Timothy J.
Assign. Date : 11/16/2023
Description: Civil Misc. (O−DECK)

## NON-PARTY ENVIRONMENTAL DEFENSE FUND, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO QUASH OR LIMIT SUBPOENA, AND TO TRANSFER THIS MOTION TO THE ISSUING DISTRICT COURT

Pursuant to Rules 26(b) and 45(d) of the Federal Rules of Civil Procedure, non-party Environmental Defense Fund, Inc. ("EDF") has moved this Court to enter an order quashing and/or limiting the subpoena that Defendant Pacific Bell Telephone Company ("Pacific Bell") served upon it on August 8, 2023 (the "Subpoena") (attached hereto as Exhibit A).[1] The Motion also asks that it be transferred to the issuing court for resolution.

The Subpoena was served in the matter captioned *California Sportfishing Protection Alliance v. Pacific Bell Telephone Company*, No. 2:21-cv-00073, which is pending in the Eastern District of California (the "California Lawsuit"). EDF has already produced a significant volume of responsive documents, but believes that other documents sought by the Subpoena are not discoverable because (i) they do not tend to prove or disprove any claim or defense in the California Lawsuit, and (ii) their (at best) marginal value in the California Lawsuit is outweighed by the undue burden that production would impose, and the chilling effect that requiring

---

[1] Pacific Bell served a similar subpoena on EDF's Senior Director for Safer Chemicals, Tom Neltner, at his home in Maryland (the "Neltner Subpoena"). The Neltner Subpoena is the subject of a substantially similar Motion to Quash or Limit, filed contemporaneously herewith.


**RECEIVED**

NOV 16 2023

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

production would have on EDF's core mission of research, education and advocacy in the public interest.

Accordingly, EDF has asked the Court to quash the Subpoena or limit EDF's duty of production to (i) documents showing the actual collection, sampling, testing, or analysis of the submarine cables at issue in the California Lawsuit; (ii) the contracts between EDF and non-party Marine Taxonomic Services, Ltd. ("MTS") and related invoices; and (iii) communications with Below the Blue ("BtB") a small a small, non-profit, community-based organization that discovered the Lake Tahoe cables more than a decade ago, and whose principal researchers also work for MTS; and specifically excluding (i) communications with the *Wall Street Journal* and other media, (ii) communications with Congressional staff; and (iii) documents and communications concerning EDF's and Mr. Neltner's work on lead, generally. EDF's Motion also asks that the Court limit EDF's duty of production to documents created between March 1, 2022, and August 23, 2023.

## PARTIES

The plaintiff in the California Lawsuit is the California Sportfishing Protection Alliance (a non-profit public benefit corporation), and the sole defendant is Pacific Bell.

EDF is not a party to this lawsuit. It is a non-profit organization that is non-governmental and non-partisan; it works with other non-profit organizations, as well as business and governmental entities, to create solutions to the most serious environmental problems throughout the world. EDF is a public interest organization whose core mission is research, education and advocacy in the public interest. Tom Neltner is, and at all times relevant to this Motion was, employed by EDF as its Senior Director for Safer Chemicals. As relevant to this Motion, EDF acknowledges that Mr. Neltner's activities were within the scope of his employment by EDF.

## BACKGROUND

The underlying lawsuit is a citizen suit filed by the California Sportfishing Protection Alliance under the federal Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a)(1)(B) ("RCRA"), and the California Safe Drinking Water and Toxic Enforcement Act of 1986, Health & Safety Code §§ 25249.5 et seq. ("Prop. 65"). Pacific Bell is a legacy telecommunications company (owned by AT&T Teleholdings) that provides telecommunications services in California.

The original complaint was filed in January 2021, and the operative Second Amended Complaint (the "Complaint") was filed in August 2021 (attached hereto as Exhibit B). The Complaint alleges that Pacific Bell is responsible for environmental contamination attributable to *two* lead-clad submarine telecommunications cables that traverse portions of Lake Tahoe. (Complaint ¶ 5.) The claims asserted in the Complaint are premised on water sampling and testing that were conducted *before the lawsuit was filed*. The Complaint does not reference any other cables or locations, nor does it mention EDF, Mr. Neltner, MTS or the *Wall Street Journal*. Thus, its scope is quite narrow.

In November 2021, the parties to the California Lawsuit entered into a voluntary consent decree that provided for the removal of certain Lake Tahoe cables within 90 days of receiving necessary approvals. The district court issued an order consistent with that agreement, but after more than two years without the cables being removed, the consent decree was vacated by the Defendant and active litigation ensued.

Upon information and belief, it was *after* the Complaint had been filed and after the consent decree entered, that the *Wall Street Journal* (the "WSJ") began to investigate the extent to which environmental contamination across the country was attributable to lead-clad telecommunication cables in land, air and water. The WSJ's investigation culminated in a series of news articles (the "WSJ Articles") that were published in July 2023, based in part on water, soil, sediment and metal

3

samples obtained by MTS from six sites in nine states proximate to lead-clad telecommunications cables across the country, and analysis by a third-party laboratory that indicated lead in nearby soil or sediment likely originated in the lead-clad cable.[2]

Pacific Bell elected on July 27, 2023 to vacate the consent decree. One week later, it issued the Subpoena, apparently based on information that EDF had played a role in educating the WSJ, BtB[3] and MTS concerning environmental lead contamination and sampling generally, and in funding MTS' *post-Complaint* and *post-consent decree* sampling activities at six locations across the country. At the same time, Pacific Bell issued a similar – but even more expansive – subpoena to Mr. Neltner.

The Subpoena demands that EDF produce a wide range of documents and communications that are not confined to the issues in dispute in the California Lawsuit, and it does not respect EDF's role as a disinterested third party.[4] Several requests are instructive:

- Request No. 7 demands all documents related to, and communications with, any person referenced in the *WSJ* Articles concerning any testing or analysis of lead-clad cables generally.

- Request No. 9 demands all documents and communications regarding lead-clad cables generally (*i.e.*, regardless of location) or the California Lawsuit.

- Request No. 10 demands all documents and communications regarding any agreement between EDF and any party regarding lead-clad cables generally, the California

---

[2] The Subpoena defines the "WSJ Articles" to include five particular articles, "and any forthcoming articles related to the same subject matter." *See* Ex. A at Definitions.

[3] EDF acknowledges that Pacific Bell recently prevailed on a motion to compel to enforce a similar third-party subpoena against BtB. EDF respectfully submits that ruling is neither persuasive nor dispositive here, however, because BtB (which was not represented by counsel) did not file any opposition to the motion to compel. Thus, the court did not have an opportunity to consider the arguments raised by EDF here.

[4] EDF has no financial stake in the outcome of the California Lawsuit, and it has no common interest agreement with the plaintiff.

Lawsuit, or the *Wall Street Journal*'s investigation into environmental harm caused by lead-clad cables.[5]

- Request No. 11 demands all documents and communications related to any research, sampling, testing, data, analysis, drafts, reports or studies that EDF requested, performed, or collected for or on behalf of the *Wall Street Journal* (or plaintiff or plaintiff's counsel) relating to lead, generally.

- Request No. 12 demands all documents and communications related to statements about AT&T, Inc. (including subsidiaries) or any other telecommunications company referenced in the *WSJ* Articles. The request appears to be an unbounded deep-dive into anything that EDF has ever written about AT&T or any other telecommunications company referenced in the WSJ Articles (*i.e.*, not limited to lead-clad cable, or even lead generally, and arguably inclusive of other wholly unrelated communications by EDF with participants in the telecommunications industry)).

- Request No. 14 demands all communications with any federal, state, or local governmental or regulatory agency related to lead-clad cables generally (*i.e.*, not limited to Lake Tahoe).

- Request No. 15 demands all documents disseminated to any news outlet regarding lead-clad cables generally (*i.e.*, not limited to Lake Tahoe).

- Request No. 16 demands all documents concerning any research or investigation on the possible or actual adverse effects of lead-clad cables generally (*i.e.*, not limited to Lake Tahoe).

---

[5] The Subpoena defined the "WSJ Investigation" to mean "any investigation, research, sampling, testing, analysis, factfinding, or diligence that the WSJ conducted, gathered, commissioned, or requested, relating to cables (of any type) or lead, leading up to, in connection with, or following the WSJ Articles. Thus, even the definition is not limited to the Lake Tahoe cables that are the subject of the California Lawsuit.

Compounding its substantive overbreadth, the Subpoena includes no backward or forward-looking temporal limitation. In fact, the instructions specify that its requests are "continuing in nature" such that EDF is directed to produce "further responsive information" that may come into its possession in the future. EDF is nearly a 60-year-old public interest nonprofit that has worked – indeed was founded – to address the harmful effects of environmental toxins, including lead contamination, and it expects that work will continue long into the future. In this context, Pacific Bell's failure to include any temporal limitations is remarkable.

In these respects and others, the Subpoena is breathtaking in its scope. Indeed, Pacific Bell made no effort to limit the Subpoena to relevant factual matter (*i.e.*, data concerning the **two** cables at issue); instead, the Subpoena seeks, essentially, every shred of information and opinion concerning lead-clad cables, even lead generally that EDF, a public interest group that is well known to work in this area, has ever had, will have or communicated. The Subpoena is an invasive examination of EDF's internal thinking, external communications, strategies and activities on the subject of lead-clad cable contamination generally, and even *lead generally* (*i.e.*, not limited to lead-clad cable), notwithstanding that EDF is not a party to the lawsuit, and its opinion(s) regarding lead and lead-clad cables are irrelevant. The Subpoena is a fishing expedition; and the marginal value (if any) that these documents would have for the California Lawsuit is outweighed by the undue burden and chilling effect that requiring production would impose. *See* Fed. R. Civ. P. 26(b) (defining the scope and limits of discovery); discussion *infra*.[6]

EDF timely informed Pacific Bell of its objections to the Subpoena (*see* Exhibit C), and it proceeded to collect *potentially* responsive documents according to search terms, custodians and a date range *provisionally* agreed to by Pacific Bell during the course of several meet-and-confer

---

[6] Request No. 11 is particularly troubling in as much as it seeks documents concerning lead generally, which would include myriad applications having nothing whatever to do with lead-clad cables or contamination of Lake Tahoe.

discussions. Pursuant to that process, EDF produced (on September 8, 2023, and October 24, 2023), on behalf of itself and Mr. Neltner, 8,967 pages of documents directly responsive on the issue of the two Lake Tahoe cables and, in a show of good faith aligned with public interest in disclosing the data notwithstanding its irrelevance to the California Lawsuit, produced documents on the other sites as well. EDF did so without insisting upon a *quid pro quo* agreement to narrow the scope of the Subpoena or withdraw Mr. Neltner's equally overbroad subpoena. [7]

The documents that EDF produced include everything that might be relevant to prove or disprove the claims and defenses of either party in the California Lawsuit – *and more*, including:

- all documents showing the collection, sampling, testing, and analysis of the two submarine cables at issue in the California Lawsuit, which data EDF had received from MTS;

- the contracts between EDF and MTS, and related invoices and laboratory contracts; and

- all documents related to sampling, testing, and analysis performed on the Lake Tahoe cables, as well as data about extraneous sites in Idaho, Louisiana, Michigan, Oregon, Pennsylvania, New Jersey, New York and West Virginia. [8]

Thus, EDF has produced all documents in its possession, custody or control related to sampling, testing and analysis performed on the Lake Tahoe cables (*i.e.*, the data that may prove or disprove the existence of contamination alleged in the Complaint), subject to an exclusion for attorney-

---

[7] EDF's document collection and production included documents in the possession, custody or control of Mr. Neltner, because his possession of them was within the scope of his employment by EDF.

[8] EDF does not agree that documents concerning sites other than Lake Tahoe are relevant to the California Lawsuit. EDF produced this additional data solely as a good faith gesture, and because disclosure is in the public interest.

client privilege and communications with the *Wall Street Journal*, other media and Congressional staff.

What EDF has not produced are documents *about* the data (*e.g.*, what EDF or others may think about the analytical results, or the steps that EDF or others should take in light of those results). Nor has EDF produced extraneous documents and communications concerning its knowledge and initiatives regarding lead-clad cables or lead generally. EDF has not produced these documents because it believes they are not relevant to prove or disprove a claim or defense in the California Lawsuit. Simply put, what EDF *thinks* about the Lake Tahoe (or other) data, or potential strategies in response thereto, is irrelevant and therefore not discoverable. But, even if the additional documents that Pacific Bell seeks had some marginal value in the California Lawsuit (which they do not), that value would be outweighed by the undue burden that additional production would impose, and the chilling effect that requiring production would have on EDF's core mission of sponsoring and conducting research, education and advocacy in the public interest.

EDF filed this Motion to obtain the Court's guidance and instruction concerning the scope of its obligations – which EDF respectfully submits should be limited, and for an award of reasonable attorney fees and costs to respond to the Subpoena and pursue this Motion.

Finally, because this Motion rests primarily on an argument concerning relevance *vel non* of the requested materials, EDF has asked that this Motion be transferred for resolution by the court where the California Lawsuit is pending.

## DISCUSSION

Parties "may obtain discovery regarding any nonprivileged matter that is **relevant to any Party's claim or defense and proportional** to the needs of the case, considering the **importance of the issues** at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, **the importance of the discovery in resolving the**

**issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit**…." *See* Fed. R. Civ. P. 26(b) (emphasis added).

A party's right to discovery is not unlimited. *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). The Court must "quash or modify a subpoena that… subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(i-iv). "If a subpoena compels disclosure of information that is not properly discoverable, then the burden it imposes, however slight, is necessarily undue: why require a party to produce information the requesting party has no right to obtain?" *AF Holdings, LLC v. Does 1-1058*, 752 F.3d 990, 995, 410 U.S. App. D.C. 41, 46 (2014). "The trial court's discretion extends to determining the relevance of discovery requests, assessing their oppressiveness, and weighing these factors in deciding whether discovery should be compelled." *In re Multi-Piece Rim Prod. Liab. Litig.*, 653 F.2d 671, 679 (D.C. Cir. 1981). "[C]oncern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs." *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998). *See also Watts v. S.E.C.*, 482 F.3d 501, 509 (D.C. Cir. 2007) ("The Rule 45 'undue burden' standard requires district courts supervising discovery to be generally sensitive to the costs imposed on third parties.").

Because Rule 45 incorporates the relevancy requirement of Federal Rule of Civil Procedure 26, "the Court must first consider 'whether the discovery sought is relevant to a party's claim or defense in the underlying litigation.'" *Diamond Servs. Mgmt. Co., LLC v. Knobbe, Martens, Olson & Bear, LLP*, 339 F.R.D. 334, 338 (D.D.C. 2021) (quoting *BuzzFeed, Inc. v. DOJ*, 318 F. Supp. 3d 347, 356 (D.D.C. 2018)). The party seeking the third-party discovery bears the burden of demonstrating its relevance to the underlying litigation. *See Tequila Centinela, S.A. de C.V. v. Bacardi & Co. Ltd.*, 242 F.R.D. 1, 9 (D.D.C. 2007). "Discovery [ ] is not intended to be a fishing expedition, but rather is meant to allow the parties to flesh out allegations for which they initially have at least a modicum of objective support." *Diamond Services*, 339 F.R.D. at 340 (quashing subpoena and finding that "The slim chance of a 'likely benefit' from enforcing" the subpoenas at

issue "further weighs against" compelling the discovery) citing *Cleveland-Goins v. City of New York*, No. 99-cv-1109, 1999 WL 673343, at *2 (S.D.N.Y. Aug. 30, 1999)).

When determining whether a subpoena imposes undue burden and expense on the person to whom it is directed, courts may consider whether the materials or things requested are relevant to the subject matter of the action or to the investigation being pursued. *Boeing Airplane Co. v. Coggeshall*, 280 F.2d 654, 3 Fed. R. Serv. 2d 799 (D.C. Cir. 1960). Although relevance is construed broadly, it is not without its limits and "does not encompass discovery of information with 'no conceivable bearing on the case.'" *Anton v. Prospect Café Milano, Inc.*, 233 F.R.D. 216, 218 (D.D.C. 2006) (internal citations omitted). A third-party subpoena is limited in scope by the relevance requirements of Civil Rule 26(b)(1). *See Hesco Bastion Ltd. v. Greenberg Traurig LLP*, 2009 WL 5216932, at *3-4 (D.D.C. Dec. 23, 2009).

To determine whether the likely benefit outweighs the burden or expense of the requested discovery, for purposes of the proportionality requirement for discovery, courts consider a number of factors: importance of the issues at stake in the action; amount in controversy; parties' relative access to relevant information; parties' resources; importance of the discovery in resolving the issues; and the actual burden or expense of the requested discovery. *Wall v. Reliance Standard Life Insurance Company*, 341 F.R.D. 1, 5–6 (D.D.C. 2022) citing Fed. R. Civ. P. 26(b)(1). "[N]o single factor is designed to outweigh the other factors in determining whether the discovery sought is proportional," and "all proportionality determinations must be made on a case-by-case basis." *Oxbow Carbon & Minerals LLC v. Union Pacific Railroad Company*, 322 F.R.D. 1, 6 (D.D.C. 2017) (internal citations omitted).

Moreover, "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an

10

appropriate sanction--which may include lost earnings and reasonable attorney's fees--on a party or attorney who fails to comply." Fed. R. Civ. P. 45(d)(1).

**A. The Court Should Quash or Limit the Subpoena to Exclude Information That is Not Discoverable.**

The Subpoena demands production of information that is not discoverable because it would not tend to prove or disprove any claim or defense in the California Lawsuit.

The California Lawsuit is narrow:  it is an RCRA and Prop. 65 citizen suit focused on environmental harm allegedly caused by two submarine telecommunications cables in Lake Tahoe. Documents that show the collection, sampling, testing and analysis of those cables are relevant, and they have been produced. Consistent with EDF's public interest mission, all data related to collection, sampling, testing and analysis of lead-clad cables at other locations across the country, done as part of the same investigation, have also been produced as a gesture of good faith, even though not relevant to the actual Complaint. The additional documents that Pacific Bell demands – *i.e.*, documents that do not describe the location, sampling and analytical data itself – are not discoverable because they do not tend to prove or disprove any party's claims or defenses. *See* Fed. R. Civ. P. 26(b). Requiring production of these extraneous documents would be unduly burdensome and disproportionate to the needs of the case, and it would have a chilling effect on EDF's important public interest work.

For example, the Subpoena demands that EDF produce all documents and communications concerning lead-clad cables generally (*i.e.*, untethered to the location of cables at issue), including its own research and investigation, its internal thinking, and its external communications with governmental regulators about those issues. *See* Ex. A (Subpoena), Req. Nos. 9, 14, 15 & 16. Pacific Bell essentially demands production of all documents and communications that EDF has ever had, internally or with others, about lead-clad cables generally, and about AT&T or other telecommunications companies referenced in the WSJ articles.  And, in one instance, the Subpoena demands that EDF produce all documents and communications related to *any* research, sampling,

11

testing, data, analysis, drafts, reports or studies that EDF requested, performed, or collected for or on behalf of the *Wall Street Journal* relating to lead generally (*i.e.*, not tethered to lead-clad cables or Lake Tahoe). *See id.*, Req. No. 11. These sweeping demands go well beyond the issues in dispute, and such broad disclosure would serve no productive purpose.[9]  The California Lawsuit is about two particular cables in Lake Tahoe, and nothing more.

Separate and apart from Pacific Bell's improper demand for information unrelated to Lake Tahoe, its demand for discovery into what EDF *thinks about* lead-cable contamination is utterly irrelevant to Pacific Bell's responsibility for contamination in Lake Tahoe. EDF has produced all documents showing the actual collection, sampling, testing, and analysis of the two lead-clad cables at issue, as well as the data related to collection, sampling, testing and analysis of lead-clad cables in other locations around the country in the same investigation; but its internal and external thoughts about the lead-clad cables, the *Wall Street Journal*'s investigation, how best to interpret the Lake Tahoe data, or what public interest might be considered in light of the data, simply are

---

[9] The Neltner Subpoena goes further than the EDF Subpoena, demanding that he produce, among other things, "all Documents and Communications related to any research, sampling, testing, data, analysis, drafts, reports, or Studies You requested performed, or collected for or on behalf of . . . the Environmental Defense Fund . . . concerning or discussing lead" (*i.e.*, not only lead-clad cables). This request would extend, for example, to lead paint and lead in water supplies or food. The obvious overbreadth is addressed more fully in the separate Motion to Quash or Limit the Neltner Subpoena.

not relevant to any party's claim or defense in the California Lawsuit.[10] What arguably is relevant is the data, and the data has been produced.[11]

### B. The Court Should Quash or Limit the Subpoena Because It Imposes an Undue Burden.

The Court "must quash or modify a subpoena that … subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iv). Factors to be considered in determining whether a subpoena imposes an undue burden include: (i) whether the discovery sought is unreasonably cumulative or duplicative, (ii) whether the discovery sought can be obtained from some other source that is more convenient, less burdensome, or less expensive, and (iii) whether the discovery sought is proportional to the needs of the case, taking into account the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. *BuzzFeed, Inc. v. U.S.*

---

[10] Two categories of external communications merit further attention. EDF has withheld communications with the *Wall Street Journal*, other media and Congressional staff on the basis that they are cumulative (*i.e.*, they merely recite data that EDF separately produced to Pacific Bell) and/or describe EDF's impressions of the data and what should be done about it. Requiring a third party to produce cumulative discovery, even if arguably relevant, would be unduly burdensome, and requiring a non-profit organization such as EDF to disclose its communications with entities unrelated to the claims in the California Lawsuit would have a serious chilling effect on EDF and others. In both instances, requiring production would be disproportionate to the needs of the case because of the marginal value the information would provide in view of the fact that EDF already produced the data itself.

[11] Pacific Bell has asserted that EDF's discussions and opinions about the sampling and data are relevant to show EDF's supposed bias in funding and guiding the data collection and analysis effort. But, any bias on the part of EDF is not relevant to the California Lawsuit because EDF is neither a party nor a witness. The only bias that matters "is that of a witness or party in the case, not of an unrelated non-party." *North Carolina Right to Life, Inc. v. Leake*, 231 F.R.D. 49, 51 (D.D.C. 2005) (held that organization was not entitled to compel discovery in question, since asserted reason for organization's need for information relating to the non-profit's contacts and their funding relationships, bias, was irrelevant, and burden on non-parties was great).

*Department of Justice*, 318 F. Supp. 3d 347, 358 (D.D.C. 2018) (quoting Fed. R. Civ. P. 26(b)(1), (2)(C)).

The foregoing analysis is particularly significant when discovery is sought from a non-party. *See Watts v. SEC*, 482 F.3d 501, 509 (D.C. Cir. 2007) ("The Rule 45 'undue burden' standard requires district courts supervising discovery to be generally sensitive to the costs imposed on third parties.").

As discussed *supra*, the requests that are the subject of this Motion seek information that is not discoverable because it would not tend to prove or disprove any claim or defense in the California Lawsuit (*i.e.*, it is not discoverable within the meaning of Rule 26(b)). Necessarily, therefore, the burden that Pacific Bell seeks to impose on EDF is undue because it is not aimed at proving or disproving any fact of consequence.

Even if the information sought had some marginal relevance to the case at hand, however, its value is outweighed by the human and financial burden of production, and the chilling effect that enforcement would have on EDF's public interest mission. Pacific Bell is on a mission to (i) harass EDF to such a degree that it will stand down in its efforts to advocate in the public interest, and (ii) learn everything that EDF knows, believes, does and may do about pollution caused by lead-clad cables or lead in any location and under any circumstances. These are not proper purposes of discovery, and approving that effort would impose a substantial burden and expense on EDF to respond – with far-reaching and detrimental precedential effect. Indeed, EDF (and other similarly-situated non-profit public interest organizations) should be able to investigate and advocate in the public interest without fear that alleged wrongdoers will be free to burden it/them with costly and invasive examinations of all its/their activities untethered by the issues actually in litigation and pursued in litigation to which EDF is not a party.

EDF already has devoted inordinate human and financial resources to collecting, reviewing and producing data concerning the sampling and analysis of lead-clad cable contamination in Lake

Tahoe. Given the narrow scope of the California Lawsuit, that is more than should be required of a non-party.

**C.  The Court Should Award EDF its Reasonable Fees and Costs.**

The party responsible for issuing a subpoena must "take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena." Fed. R. Civ. P. 45(d)(1).  Pacific Bell has taken no such steps. Indeed, as discussed more fully *supra*, Pacific Bell issued a Subpoena that demands the production of documents well beyond any reasonable understanding of discoverability. The Subpoena is not limited to data showing the nature and extent of contamination attributable to the two Lake Tahoe cables at issue in the California Lawsuit, but instead demands virtually every document in EDF's possession, custody or control concerning lead-clad cables generally. EDF has devoted considerable time and effort to attempt to resolve the issues presented by this Motion, but Pacific Bell has not agreed to narrow the scope of the Subpoena – repeatedly emphasizing during the course of several meet-and-confer discussions that there would be "no agreement" on any disputed issue (*e.g.*, date range, documents sought) until there is an agreement on all issues. There is no such agreement.

Under these circumstances, EDF respectfully submits that Pacific Bell failed to take reasonable (or any) steps to avoid imposing an undue burden and expense on EDF, and that the Court should, therefore, direct Pacific Bell to reimburse EDF its reasonable and necessary attorneys' fees and costs incurred to respond to the Subpoenas and to pursue this Motion.

**D.  The Court Should Transfer this Motion to the Eastern District of California.**

The Subpoena was not issued by this Court, but it demands compliance (*i.e.*, the production of documents) at the Washington, D.C. office of Pacific Bell's counsel. *See* Ex A.  Accordingly, EDF was required to file this Motion in this Court. *See* Fed. R. Civ. P. 45(d)(3) ("the court for the district where compliance is required must quash or modify a subpoena…"). This Court may, however, transfer this Motion to the issuing court (*i.e.*, the Eastern District of California) if the

15

person subject to the Subpoena (*i.e.*, EDF) consents, or if the Court finds exceptional circumstances. *See* Fed. R. Civ. P. 45(f). EDF expressly consents to such a transfer because it believes the issuing court will be in the best position to resolve issues of relevance and discoverability. Moreover, should other non-parties similarly move to quash or limit subpoenas on similar grounds, the issuing court will be in the best position to resolve such motions in a consistent manner.

**CONCLUSION**

For the foregoing reasons, Environmental Defense Fund respectfully requests that its Motion be granted.

DATED: November 16, 2023

<div style="margin-left:40%;">

Respectfully submitted,

BLANK ROME LLP

By: _____
Alan M. Freeman (DC Bar No. 454693)
1825 Eye Street, NW
Washington, D.C. 20006
Tel: (202) 420-2200
Fax: (202) 572-8370
Email: Alan.Freeman@blankrome.com

*Counsel for Environmental Defense Fund*

</div>

*Of Counsel*:

Naomi Zwillenberg
BLANK ROME LLP
One Logan Square
Philadelphia, PA 19103
Tel: (215) 569-5426
Fax: (215) 834-5426
Email: Naomi.Zwillenberg@blankrome.com

Oliver Jury
BLANK ROME LLP
1825 Eye Street, NW
Washington, D.C. 20006

Tel: (202) 420-715
Fax: (202) 217-3465
Email: Oliver.Jury@blankrome.com

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Eastern District of California

| | |
|---|---|
| California Sportfishing Protection Alliance ) | |
| *Plaintiff* ) | Civil Action No.  2:21-cv-00073 |
| v. ) | |
| Pacific Bell Telephone Company ) | |
| ) | |
| *Defendant* ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Environmental Defense Fund, 1875 Connecticut Ave., NW Suite 600, Washington, DC 20009

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: The materials described in Schedule A

| Place: Paul Hastings LLP<br>2050 M Street NW<br>Washington, DC 20036 | Date and Time:<br><br>14 days from service |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  8/4/23

| CLERK OF COURT | | |
|---|---|---|
| _____<br>*Signature of Clerk or Deputy Clerk* | OR | _____<br>*Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Defendant Pacific Bell Telephone Company _____ , who issues or requests this subpoena, are:

Navi Dhillon, Paul Hastings LLP, 101 California Street, 48th Fl, San Francisco, CA 94111; Ph: 415-856-7000

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 2:21-cv-00073

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____                _____
                                               *Server's signature*

                                        _____
                                               *Printed name and title*

                                        _____
                                               *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
   **(i)** is a party or a party's officer; or
   **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
   **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
   **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
   **(i)** fails to allow a reasonable time to comply;
   **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
   **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
   **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
   **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

   **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
   **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
   **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
   **(i)** expressly make the claim; and
   **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE A

## PACIFIC BELL TELEPHONE COMPANY'S REQUESTS TO
## THE ENVIRONMENTAL DEFENSE FUND TO PRODUCE DOCUMENTS

In accordance with Federal Rule of Civil Procedure 45, You are requested to produce the following documents and tangible items for inspection.

## DOCUMENTS TO PRODUCE

1. All Documents and Communications, including pictures and videos, concerning any sections of lead-clad cables removed from Lake Tahoe by You or other persons acting on Your behalf, including but not limited to Marine Taxonomic Services, Ltd., Seth Jones, and Monique Rydel Fortner.

2. All Documents and Communications concerning or discussing permits requested or obtained by You or other persons acting on Your behalf, including but not limited to Marine Taxonomic Services, Ltd., Seth Jones, and Monique Rydel Fortner, to test, cut or remove any sections of lead-clad cables in or from Lake Tahoe.

3. All Documents and Communications, including but not limited to any pictures, videos, or test results, relating to any "kiddie pool" used by You or others acting on Your behalf, including but not limited to Marine Taxonomic Services, Ltd., Seth Jones, and Monique Rydel Fortner, to test lead-clad cables removed from Lake Tahoe or elsewhere.

4. All Documents related to the experience or qualifications of Marine Taxonomic Services, Ltd., Below the Blue, Seth Jones, or Monique Rydel Fortner to perform sampling, testing, or analysis of lead-clad cables in water, soil, or aerial environments.

5. All Documents and Communications concerning the Marine Taxonomic Services and Below the Blue Lead Cable Investigation Report, available at https://belowtheblue.org/edf-report (the "EDF Report").

6. All Documents and Communications concerning the method by which sampling locations were selected at Lake Tahoe or other locations referenced in the WSJ Articles, including Documents and Communications relating to the statement in the EDF Report that "[s]ampling locations were chosen in part by their likelihood to show high lead levels."

7. All Documents related to and Communications between You and any party described or otherwise referenced in the WSJ Articles, or Plaintiff or Plaintiff's counsel in the Lawsuit, concerning or discussing the WSJ Articles, the WSJ Investigation, any testing or analysis of lead-clad cables (including any draft reports) or the Lawsuit, including but not limited to Marine Taxonomic Services, Ltd., Wall Street Journal, Pace Analytical Services, Environmental Systems Research Institute, MCH Strategic Data, Quest Diagnostics, Pure Earth; Environmental Council of the State, Altec Testing & Engineering, Inc., RTI International, ALTA Environmental Corporation, Seth Jones, Monique Fortner, Jack

Caravanos, Tom Neltner, Ben Grumbels, Bruce Nelson, Bryan Stolte, Jennifer Redmon, Braden Allenby, Gordon Binkhorst, James Winn, Dr. Phillip Landrigan, or any "environmental researchers."

8. All invoices for work performed relating to the Lawsuit, the WSJ Articles, the WSJ Investigation, or lead-clad cables, including but not limited to work performed for any individuals or entities listed in Request No. 7.

9. All Documents and Communications concerning or discussing the Lawsuit, the WSJ Investigation, the WSJ Articles, or lead-clad cables at Lake Tahoe or elsewhere, including research, sampling, testing, data, analysis, drafts, reports, or Studies.

10. All Documents and Communications concerning or discussing any agreement between You and any party relating to the Lawsuit, the WSJ Articles, the WSJ Investigation, or lead clad cables, including Plaintiff or any of Plaintiff's counsel in the Lawsuit, and any individuals or entities listed in Request No. 7.

11. All Documents and Communications related to any research, sampling, testing, data, analysis, drafts, reports, or Studies You requested, performed, or collected for or on behalf of the Wall Street Journal or Plaintiff or Plaintiff's counsel in the Lawsuit, relating to lead, the WSJ Investigation, Lake Tahoe, or the Lawsuit.

12. All Documents or Communications related to statements about AT&T, Inc., any of its subsidiaries, or any current or former telecommunications company referenced in the WSJ Articles.

13. All Documents and Communications exchanged between You and any current or former employee of Defendant or AT&T, Inc. related to lead-clad cables.

14. All Communications between You and any federal, state, or local governmental or regulatory agency related to or otherwise referencing the following:

    (i)     the Lawsuit;

    (ii)    the WSJ Articles;

    (iii)   the WSJ Investigation; or

    (iv)    lead-clad cables, including but not limited to their location, potential removal, environmental impact, or health effects.

15. All Documents or writings of any nature You have disseminated to any News Outlet regarding lead-clad cables.

16. All Documents prepared by You, for the benefit of You, or provided to You concerning any Study, research or investigation on the possible or actual adverse effects of lead-clad cables.

2

17.  All Documents and Communications relating to Your participation in or funding of any test or Study related to or otherwise concerning lead-clad cables.

## TANGIBLE ITEMS FOR INSPECTION

All samples or other tangible items on which You or any party acting at Your direction conducted any testing, analysis, evaluation, or investigation in connection with the WSJ Articles, the WSJ Investigation, or lead-clad cables.

## DEFINITIONS

1.  "**Communications**" means, without limitation, any oral communication, whether transmitted in meetings, by telephone, tape recordings, voice-mail or otherwise, and all written communications, including communications by e-mail or other electronic- or internet-based communications system. For the sake of clarity, Communications shall include internal and external communications.

2.  "**Defendant**" means Defendant Pacific Bell Telephone Company.

3.  "**Document**" means all materials within the full scope of Federal Rule of Civil Procedure 34, including: all writings and recordings, including the originals and all non-identical copies (including, without limitation, e-mail and attachments, correspondence, memoranda, notes, diaries, minutes, statistics, letters, minutes, receipts, summaries, pamphlets, books, interoffice and intraoffice communications, photographs, charts, videotape, recordings, motion pictures, plans, drawings, surveys, and electronic, mechanical, magnetic, optical, or electronic records or representations of any kind. For the sake of clarity, Documents shall include internal and external Communications.

4.  "**Lawsuit**" means the case captioned *California Sportfishing Protection Alliance v. Pacific Bell Telephone Co.*, 2:21-cv-00073-JDP, currently pending in the Eastern District of California.

5.  "**News Outlet**" means any persons or entities engaged in the act of reporting news whether orally, in print, televised, via mail or e-mail, or on the internet, including all newspapers, magazines, periodicals, documentaries, television shows, list-servs, forums, blogs, vlogs, tweets, and posts.

6.  "**Study**" or "**Studies**" means any published or unpublished, reported or unreported, final or draft, performed or abandoned, planned, or proposed analysis, assessment, peer reviewed or non-peer reviewed, data collection, experiment, research, survey, test, or trial.

7.  "**WSJ Articles**" means the following Wall Street Journal articles, and any forthcoming articles related to the same subject matter: S. Pulliam *et al.*, *America is Wrapped in Miles of Toxic Lead Cables*, THE WALL STREET JOURNAL (July 9, 2023), available at https://www.wsj.com/articles/lead-cables-telecoms-att-toxic-5b34408b; J. West *et al.*, *How the Journal Investigated Hidden Lead Cables Circling the U.S.*, THE WALL STREET JOURNAL (July 9, 2023), available at https://www.wsj.com/articles/lead-cables-investigation-att-methodology-1703dbb0; S. Ramachandran *et al.*, *What AT&T and*

3

*Verizon Knew About Toxic Lead Cables*, THE WALL STREET JOURNAL (July 12, 2023), available at https://www.wsj.com/articles/att-verizon-lead-cables-telecom-5e329f9; S. Ramachandran *et al.*, *I Was Really Sick, and I Didn't Know From What*, THE WALL STREET JOURNAL (July 14, 2023), available at https://www.wsj.com/articles/lead-cables-exposure-workers-ca6d67f0; J. West *et al.*, *Bayou Teche is an Epicenter of America's Lead Cable Problem*, THE WALL STREET JOURNAL (July 10, 2023), available at https://www.wsj.com/articles/lead-cables-louisiana-telecoms-59f36ffe.

8.    **"WSJ Investigation"** means any investigation, research, sampling, testing, analysis, fact-finding, or diligence that the WSJ conducted, gathered, commissioned, or requested, relating to cables (of any type) or lead, leading up to, in connection with, or following the WSJ Articles.

9.    **"You"** or **"Your"** means the Environmental Defense Fund and any of its representatives, agents, employees, administrators, boards, vendors and other persons or entities acting on its behalf.

## INSTRUCTIONS

1.    The terms "or" and "and" shall be interpreted either conjunctively or disjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope.

2.    "All," "any," "each," and "every" shall each be construed as both "each" and "every" to bring within the scope of the request all responses that might otherwise be construed to be outside its scope.

3.    "Concerning" shall be construed to bring within the scope of the Request all documents that comprise, evidence, constitute, describe, refer to, were reviewed in conjunction with, or were generated as a result of the subject matter of the Request.

4.    "Including" shall be construed to mean "including but not limited to."

5.    This Subpoena requests Documents and Communications in Your possession, custody, or control.

6.    All definitions set forth above are in addition to the defined words' standard meanings.  If You contend that You do not understand the definition of the term or phrase used in any Request, then You should respond to that portion of the Request that You do understand and explain what it is that You do not understand with regard to the remainder of the Request. If You believe that any Request is overbroad in part, then You should respond to that portion of the Request that You do not consider overbroad and explain why You believe the remainder is overbroad.

7.    You are required to produce not only the original or an exact copy of the original of all Documents and Communications responsive to any of the Requests listed below, but also all copies of such Documents and Communications which bear any notes or markings not found on the original and all preliminary, intermediate, final, and revised drafts or

embodiments of such Documents and Communications. You are required to produce all versions of such Documents and Communications.

8.    Produce all Documents in complete form, with each page marked with consecutive document control numbers, and with no redactions unless necessary to avoid producing privileged information (in which case the redaction should be reflected on a privilege log).

9.    Produce Documents as they are kept in the usual course of business, or organize and label them to correspond to the categories in the request.

10.   If any document requested herein is withheld or redacted on the basis of any claim of attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity, You shall provide a written statement: (a) describing the nature of the document (e.g., letter, memorandum, minutes, telegram, notes, etc.); (b) specifying the date on which the document was prepared; (c) identifying the Person(s) who prepared or authored the document; (d) identifying the Person(s) to whom the document was sent, copied, or shown; (e) stating the privilege or other doctrine pursuant to which the document is being withheld from production and setting forth the basis for such claim of privilege or immunity from production; and (f) setting forth the subject matter of the document in a manner that, without revealing the information claimed to be privileged or protected, will enable Pacific Bell Telephone Company to assess the merit of that claim.

11.   If You are unable to produce a Document or Communication requested, please state in writing why You cannot produce the Document or Communication, including whether: (a) it is missing or lost; (b) it has been destroyed; (c) it has been transferred voluntarily or involuntarily to others; or (d) it has been disposed of otherwise. In each instance, explain the circumstances surrounding such disposition and identify the Person(s) directing or authorizing the same and the date(s) thereof. If Your inability to produce the Document or the property is because it is not in Your possession or the possession of a Person or entity from whom You could reasonably obtain it, state the name, address, and telephone number of any Person You believe may have the original or a copy of any such Document or property.

12.   These requests are continuing in nature. If, after responding to the Requests, You obtain or become aware of any erroneous information that has been provided or any further responsive information, either directly or indirectly, a supplemental answer is required. You are under a duty to amend a prior response upon learning that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not been made known to Pacific Bell Telephone Company during the discovery process or in writing.

1  ANDREW L. PACKARD (State Bar No. 168690)
   WILLIAM N. CARLON (State Bar No. 305739)
2  LAW OFFICES OF ANDREW L. PACKARD
   245 Kentucky Street, Suite B3
3  Petaluma, CA 94952
   Tel: (707) 782-4060
4  Fax: (707) 782-4062
   andrew@packardlawoffices.com
5  wncarlon@packardlawoffices.com

6  WILLIAM VERICK (State Bar No. 140972)
   KLAMATH ENVIRONMENTAL LAW CENTER
7  1125 16th Street, Suite 204
   Arcata, CA  95521
8  Tel: (707) 630-5061
   Fax: (707) 630-5064
9  Email: wverick@igc.org

10 J. KIRK BOYD (State Bar No. 122759)
   LAW OFFICE OF JOHN KIRK BOYD
11 548 Market St., Suite 1300
   San Francisco, CA 94104-5401
12 Tel: (415) 440-2500
   jkb@drjkb.com
13
   Attorneys for Plaintiff
14 CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

15                      UNITED STATES DISTRICT COURT

16                      EASTERN DISTRICT OF CALIFORNIA

17

18 CALIFORNIA SPORTFISHING          )   Case No. 2:21-CV-00073-MCE-JDP
19 PROTECTION ALLIANCE,             )
                                    )
20        Plaintiff,                )   **SECOND AMENDED COMPLAINT FOR**
                                    )   **DECLARATORY AND INJUNCTIVE RELIEF**
21    v.                            )   **AND CIVIL PENALTIES**
                                    )
22 PACIFIC BELL TELEPHONE COMPANY,  )   **(Federal Resource Conservation and Recovery**
23                                  )   **Act, 42 U.S.C. § 6972(a)(1)(B) and California Safe**
          Defendant.                )   **Drinking Water and Toxic Enforcement Act, Cal.**
24                                  )   **Health & Safety Code § 25249.5)**
                                    )
25 ─────────────────────────────────

26 //

27 //

28 //

Second Amended Complaint for Declaratory and
Injunctive Relief and Civil Penalties

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA" or "Plaintiff"), by and through its counsel, hereby alleges:

## I.     **JURISDICTION AND VENUE**

1.     This is a civil suit brought under the citizen suit enforcement provision of the Federal Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a)(1)(B) ("RCRA") and the California Safe Drinking Water and Toxic Enforcement Act of 1986 (codified as Cal. Health & Safety Code § 25249.5 *et seq.* ("Prop 65") against Pacific Bell Telephone Company ("Pac Bell" or "Defendant"). This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to RCRA Section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), 28 U.S.C. § 1331 (an action arising under the laws of the United States), 28 U.S.C. § 1367 (supplemental jurisdiction), Cal. Health & Safety Code §§ 25249.5, 25249.7(a) and (b) (Prop 65 discharge prohibition and citizen enforcement provisions), and 28 U.S.C. §§ 2201–2202 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

2.     As required by RCRA and Prop 65, between August 6, 2020 and August 20, 2020, Plaintiff provided Defendant with a written Notice of Violation of Federal Law and Notice of Intent to Begin Citizen Enforcement Action ("Notice Letter"), a true and correct copy of which is attached to this Complaint as **Exhibit A**, and which is incorporated by reference in full. *See* 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. § 135.2(a)(1). The Notice Letter was provided by certified mail return receipt requested, and by personal service on Defendant's Chief Executive Officer and agent for service of process. Plaintiff mailed a copy of the Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the California Attorney General, the Acting Director of the California Department of Resources, Recycling and Recovery, and the District Attorneys of the California counties of El Dorado and Placer, pursuant to 40 C.F.R. § 254.2 and Cal Health & Safety Code § 25249.7(d). Each of these Notice Letters were delivered to the intended recipients no later than August 27, 2020.

3.     More than ninety days have passed since Plaintiff served the Notice Letter on Defendant and the agencies. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations

1    alleged in this Complaint.

2        4.    Venue is proper in the Eastern District of California pursuant to RCRA Section 7002(a),

3    42 U.S.C. § 6972(a) and Cal. Civ. Proc. Code § 393(a), because the sources of the violations are located

4    within this District.  Venue is also proper under 28 U.S.C. § 1391(b) because a substantial part of the

5    events or omissions giving rise to Plaintiff's claims occurred in this District.  Intra-district venue is

6    proper in Sacramento, California, because the sources of the violations are located in El Dorado and

7    Placer Counties.

8    **II.    INTRODUCTION**

9        5.    This Complaint seeks relief for Defendant's ongoing violations of RCRA and the

10   discharge prohibition provisions of Prop 65.  Defendant Pac Bell operated two submarine

11   telecommunications cables ("Cables") that traversed portions of Lake Tahoe.  These Cables are situated

12   on the bottom of Lake Tahoe and, if measured end-to-end, the total length of the Cables would be

13   approximately 41,600 feet.  The two Cables share a similar structure.  Each Cable has an outer coating

14   of jute impregnated with tar/bitumens.  Inside this jute coating are 0.25 inch steel rods that run the length

15   of the submarine portions of the Cables.  These steel rods are meant to protect the inner portion of each

16   Cable.  The inner portion of each cable consists of a lead jacket with walls approximately 0.25 inches

17   thick.  This lead jacket surrounds the copper strands and is meant to protect them from contact with

18   water.  Each foot in length of the Cables contains approximately 3.3 pounds of lead.  The portions of the

19   Cables that are at issue in this case – laying on the bottom of Lake Tahoe – therefore contain

20   approximately 137,000 pounds (more than 68 tons) of lead.

21       6.    The Cables are no longer operative.  At some point in the past, Defendant replaced the

22   Cables with new, more modern cables, placed either in the same location or routed through a different

23   location.  Once a Cable was replaced, it – and all of the lead it contained – was abandoned on the bottom

24   of Lake Tahoe.  Both of the Cables at issue in this case have been abandoned.  One of the Cables has

25   been cut at one or both ends; both Cables appear to not have been in service for years.

26       7.    Plaintiff has obtained a portion of one of the Cables and has tested it to determine

27   whether the Cables are likely to leach lead into Lake Tahoe.  A piece of the Cable approximately 40

28   centimeters in length was submerged in a plastic container of Lake Tahoe water.  A sample was taken of

the water after one day and analysis of that sample showed that enough lead had dissolved from the

Cable into the water to cause the water to have a concentration of 650 micrograms of lead per liter of

water.  A second sample of the water was taken after seven days and analysis of that sample showed that

enough lead had continued to be dissolved from the Cable to raise the concentration of lead in the water

to 1,500 micrograms per liter.  A reasonable inference that can be drawn from this data is that lead in the

Cables is being disseminated into the aquatic environment of Lake Tahoe, and that humans and wildlife

who make contact with, or who drink, Lake Tahoe water are exposed to the toxic heavy metal, lead.

     8.     Lead is a chemical that is known to the State of California to cause cancer and

reproductive toxicity within the meaning of Cal. Health & Safety Code § 25249.8.  California Code of

Regulations, title 27, section 27001, subparagraphs (b) and (c).  Various agencies of California and the

United States government – including California's Office of Health Hazard Assessment, the federal

Occupational Safety and Health Administration, the federal Department of Health & Human Services

and the federal Environmental Protection Agency – have determined that exposure to lead impairs

development of the central nervous system in species that have central nervous systems, including birds,

fish and mammals, including humans, at blood lead levels as low as can be measured.  Each of these

agencies has determined that exposure to lead causes sterility in male mammals, including male humans;

and the Department of Health & Human Services and the Environmental Protection Agency have both

determined that exposure to lead delays the onset of puberty in female mammals, including female

humans.

     9.     Lake Tahoe is a water of the State of California.  The Regional Water Quality Control

Board for the Lahontan Region ("Regional Board"), as part of its Water Quality Control Plan for the

Lahontan Region ("Basin Plan"), has determined Lake Tahoe to be an existing source of municipal and

residential water supply.  The Basin Plan also states that the Regional Board has determined that the

beneficial uses of Lake Tahoe also include wildlife habitat and water contact recreation.  Lake Tahoe is

thus a water of the State of California for purposes of California Fish & Game Code § 5650 and is a

source of drinking water within the meaning of California Health & Safety Code §§ 25249.5 and

25249.11(d).  People boat on and swim in Lake Tahoe and make physical contact with its waters.  Lake

Tahoe is habitat for many species of water fowl, for fish-eating species of birds such as osprey, fishers,

1 eagles, and others members of the *accipitridea* family of birds, for many species of fish, and for marine

2 mammals such as otters.

3 **III.    THE PARTIES**

4          10.    Plaintiff CSPA is a non-profit public benefit corporation organized under the laws of

5 California, based in Stockton, California.  CSPA is dedicated to the preservation, protection and defense

6 of the environment, wildlife and natural resources of California waters, including the waters of Lake

7 Tahoe.  Members of CSPA boat on and swim in Lake Tahoe, and drink water drawn from the Lake.

8 Members of CSPA use Lake Tahoe to fish, boat, kayak, swim, bird watch, view wildlife, and engage in

9 scientific study.  Members of CSPA also work on and in the waters of Lake Tahoe, making physical

10 contact with those waters on a regular basis.  Lead that dissolves from the Cables threatens or impairs

11 each of those uses and/or contributes to such threats and impairments.  For example, lead that dissolves

12 from the Cables is present in Lake Tahoe water.  When CSPA members contact or drink that water, their

13 body burden of lead is increased and they, and/or their children, face a concomitant increased risk of

14 sterility, neurodevelopmental toxicity, cancer, and other physical ailments associated with exposure to

15 lead.  Thus, the interests of CSPA's members have been, are being, and will continue to be adversely

16 affected by Defendant's ongoing failure to comply with RCRA and Prop 65.  The relief sought herein

17 will redress the harms to Plaintiff caused by Defendant's activities because that relief will significantly

18 reduce lead being discharged from Defendant's Cables into Lake Tahoe.   To further its goals, CSPA

19 actively seeks federal and state agency implementation of state and federal laws that protect the integrity

20 of California waters, and as necessary, directly initiates enforcement actions on behalf of itself and its

21 members.

22          11.    Pacific Bell Telephone Company ("Pac Bell") is a corporation that provides

23 telecommunication services in California.

24          12.    Pac Bell had the telecommunications Cables denoted in the Notice Letter as Cables A and

25 B (herein referred to as Emerald Bay Cable and 7-Mile Cable, respectively) (including their lead

26 components) installed in Lake Tahoe.

27          13.    Pac Bell owned and operated these two telecommunications Cables as part of its business

28 providing telecommunication services.

**IV. LEGAL BACKGROUND**

    **A.    Resource Conservation and Recovery Act**

    14.    Congress enacted RCRA to provide a remedy for harm caused by disposal of solid waste that may present an imminent and substantial endangerment to health or the environment. 42 U.S.C. § 6972(a)(1)(B) authorizes commencement of a civil action to enjoin such disposal of waste. RCRA allows such a civil action to be brought against, "any person . . . who has contributed or who is contributing to the past or present handling, storage, treatment transportation or disposal of any solid or hazardous waste which may present in imminent and substantial endangerment to health or the environment."

    **B.    California's Safe Drinking Water & Toxic Enforcement Act ("Proposition 65")**

    15.    The People of the State of California have declared in Proposition 65 their right "[t]o protect themselves and the water they drink against chemicals that cause cancer, birth defects, or other reproductive harm" and "[t]o secure strict enforcement of the laws controlling hazardous chemicals and deter actions that threaten health and public safety." (Sections 1(a) and (c) of Initiative Measure, Proposition 65.)

    16.    To accomplish this goal, Proposition 65 prohibits the discharge or release of substances listed by the State of California as causing cancer or reproductive toxicity to sources of drinking water. Cal. Health & Safety Code §25249.5 states, in pertinent part:

> No person in the course of doing business shall knowingly discharge or release a chemical known to the state to cause cancer or reproductive toxicity into water or onto or into land where such chemical passes or probably will pass into any source of drinking water. . . .

    17.    Proposition 65 provides that any person "violating or threatening to violate" the statute may be enjoined in a court of competent jurisdiction. (Cal. Health & Safety Code §25249.7.) The phrase "threatening to violate" is defined to mean creating "a condition in which there is a substantial likelihood that a violation will occur." (Cal. Health & Safety Code §25249.11(e).) Violators are liable for civil penalties of up to $2,500 per day for each violation of the Act. (Cal. Health & Safety Code § 25249.7.)

//

IV.    STATEMENT OF FACTS

18.    Pac Bell, as part of its business of providing telecommunications services in California, installed two telecommunications Cables and routed submarine portions of those Cables through parts of Lake Tahoe.  One of these Cables crosses the mouth of Emerald Bay, with approximately 2,000 feet of cable submerged on the Lake bottom ("Emerald Bay Cable").  A second Cable ran (and remains) submerged for approximately 39,600 feet close to and along the western shore of the Lake ("7-Mile Cable").  More precise geographical coordinates for the location of these Cables are provided in the Notice Letter, appended hereto as **Exhibit A**, and wholly incorporated by reference into this Complaint.

19.    The Cables contain approximately 3.3 pounds of elemental lead per foot.  This lead is confined within the Cable in a crystal matrix.

20.    As time and technology progressed, the copper strands in these Cables became obsolete; cables made of fiber optic strands offered more reliability and much greater capacity.  At a yet to be determined time in the past, Pac Bell replaced the Cables, submerged portions of which are relevant to this action.  When Pac Bell installed new fiber optic cables along the same submarine right of way as the Emerald Bay Cable crossing Emerald Bay, it obtained permission from the California Lands Commission to abandon the older copper-strand-Cable in place, and did so.  The second Cable, the 7-Mile Cable, running along the western shore of the Lake has also been abandoned in place.  The Cables are no longer used for any purpose.

21.    The Cables have not been maintained and have been worn and damaged over time.  The tar-impregnated jute coating can be seen to have been abraded and washed away over certain portions of the Cables.  Boat anchors and debris have torn into parts of the Cables, exposing the lead sheathing that was originally designed to protect the copper strands from contact with water.  At least one of these Cables is cut at one or both ends, exposing the lead sheathing.

22.    When Pac Bell decommissioned the Cables, it generated a waste in the form of the Cables.  When Pac Bell abandoned the Cables, it disposed of that waste in the waters of Lake Tahoe.

23.    Lake Tahoe water contacts the lead sheathing in the Cables and dissolves the lead, and then distributes the lead throughout Lake Tahoe and its larger environment.  Lead is taken up by plants and animals and is thus introduced into the food chain of the larger Lake Tahoe ecosystem,

concentrating in organisms as the lead moves up the food chain into higher benthic level organisms. Lake Tahoe is designated as a source of domestic and municipal drinking water.

24.     For Californians, Lake Tahoe is a natural wonder, an icon. For more than 150 years, Californians have enjoyed recreating on the Lake, observing the wildlife that thrives in, on and around it. As long ago as 1869, Mark Twain described his fascination with Lake Tahoe in his novel, *The Innocents Abroad*.

25.     Lead is a chemical that has long been known to cause neuro-toxicity. In the past decade, federal government agencies published the results of three large scale overviews of the toxicity of lead. These overviews evaluated lead toxicity in light of existing body of peer-reviewed, published research. Lead is especially toxic to the developing nervous system. There are various critical phases of the development of a central nervous system, including, for example, the genesis of synapses and synaptic pruning. Lead has been shown to impair both of these critical functions. Impairment of the genesis of synapses means that the nervous system develops without all of the needed synapses, which affects learning and memory. Impairment of synaptic pruning affects the ability to focus attention and to concentrate. Being able to learn, remember and to concentrate are three key components of what is commonly called intelligence. Not surprisingly, therefore, humans and other animals exposed peri-nataly to lead exhibit impaired performance on tests designed to assess intelligence. Children exposed to lead before age 6 have been shown to lose approximately one point of IQ for each microgram per deciliter increase in their blood lead levels. All three of the federal agencies that conducted these overviews of lead toxicity (The Agency for Toxic Substances and Disease Registry, the Environmental Protection Agency and the National Toxicology Program) concluded that there is sufficient evidence to conclude that exposure to lead in developing humans impairs their short-term memory and executive function – the ability to formulate and execute a plan. Lead has been shown to be toxic in this way at exposure levels as low as can be measured. There is no level of lead exposure that has been shown not to cause neurodevelopmental toxicity.

26.     Lead causes neurodevelopmental toxicity to humans, fish, birds, non-human mammals and all other animals that have central nervous systems. Human beings, water fowl, birds, marine and other mammals, and fish are exposed to lead that leaches off the Cables into the wider water column of

Lake Tahoe. These exposures occur when these animals and humans make physical contact with Lake Tahoe water, when they drink that water, and when they ingest the flesh of other animals that have ingested lead from the water of Lake Tahoe. Once ingested, lead is absorbed into the bones and teeth of the exposed animal, and exists in a dynamic equilibrium with the lead in blood cells and blood plasma. Lead stored in bones and teeth is the major portion of the body burden of lead that most animals carry with them. Lead stored in bones is released into the blood stream under certain conditions, most often when mammals lactate. Lead released into the blood stream then perfuses developing nervous tissue, and impairing that development as described in the preceding paragraph. As such, exposure to lead that has leached off the Cables and into the Lake Tahoe water column may cause imminent and substantial harm to Lake Tahoe-associated humans and wildlife.

**FIRST CLAIM FOR RELIEF**
**Violations of RCRA**
**42 U.S.C. § 6972(a)(1)(B)**

27.     Plaintiff incorporates the allegations contained in the above paragraphs of this complaint as though fully set forth herein.

28.     To further the ends of its telecommunications business, Pac Bell has abandoned the Cables on the bottom of Lake Tahoe. As such, the Cables are solid waste within the meaning of RCRA and Pac Bell has disposed of them, also within the meaning of RCRA.

29.     The two Cables Pac Bell disposed of on the bottom of Lake Tahoe together contain more than sixty tons of lead.

30.     Lead in the Cables comes into contact with the water of Lake Tahoe, which dissolves the lead, thus causing people who make physical contact with the water to be dermally exposed to lead. This dissolved lead from the cables is also ingested by humans when they drink water from Lake Tahoe or when they eat fish caught in Lake Tahoe. Other animals in the greater Lake Tahoe ecosystem are exposed to lead in similar ways.

31.     Lead is neurodevelopmentally toxic in all animals that possess a central nervous system, is toxic to spermatogenesis and sperm health, and delays onset of puberty in female humans and females of many other species.

32.     Because many vulnerable species are exposed to lead from the Cables, Pac Bell's disposal of the Cables on the bottom of Lake Tahoe causes, or may cause, imminent and substantial harm to human health and/or the environment.  Pac Bell's continuing disposal of the Cables on the bottom of Lake Tahoe thus violates 42 U.S.C. § 6972(a)(1)(B).  As such, Pac Bell is subject to an injunction ordering Pac Bell to remove the Cables from Lake Tahoe.

## SECOND CLAIM FOR RELIEF
### Violations of Proposition 65
### California Health & Safety Code § 25249.5 *et seq.*

33.     Plaintiff incorporates the allegations contained in the above paragraphs of this complaint as though fully set forth herein.

34.     As the immediate result of its business practices, Pac Bell placed the Cables on the bottom of Lake Tahoe.  At all times relevant to this complaint, Pac Bell knew that the Cables contained lead, Pac Bell knew that the lead in the Cables would make contact with the waters of Lake Tahoe.

35.     Lead is confined inside the outer sheathing of the Cables in a crystal matrix of elemental lead in its solid state.  At all times relevant to this complaint, Pac Bell knew that, as a result of contact with Lake Tahoe water, lead in the Cables is dissolved by the Lake Tahoe water and thus escapes from the matrix, and thus from confinement in the interior of the Cables, and enters into the waters of Lake Tahoe in dissolved form.

36.     Lead in both its solid and dissolved forms is a substance listed as known to cause cancer and reproductive toxicity pursuant to California Health & Safety Code § 25249.8 and California Code of Regulations, title 27, section 27001, subparagraphs (b) and (c).

37.     The Regional Water Quality Control Board for the Lahontan Region as part of its Water Quality Control Plan for the Lahontan Region ("Basin Plan"), has determined Lake Tahoe to be an existing source of municipal and residential water supply.  The Basin Plan also has determined that beneficial uses of Lake Tahoe include wildlife habitat and water contact recreation.  Lake Tahoe is thus a water of the State of California for purposes of California Fish & Game Code § 5650 and is a source of drinking water within the meaning of California Health & Safety Code §§ 25249.5 and 25249.11(d).

38.     At all times relevant to this complaint, more than nine people have provided service to

Pac Bell at the control and direction of that company.  In exchange for this service, Pac Bell pays money to those providing it service.  As such, at all times relevant to this complaint, Pac Bell has had ten or more employees within the meaning of California Labor Code section 3351, within the meaning of California Code of Regulations, title 27, section 25102, subparagraph (h), and thus within the meaning of California Health & Safety Code section 25249.11, subparagraph (b).

39.     Because lead has escaped, is escaping and will continue to escape from the crystal matrix in which the lead is confined in the Cables, thus entering into the waters of Lake Tahoe, and because Pac Bell knew (and knows) this to be the case, Pac Bell has violated, and continues to violate, California Health & Safety Code section 25249.5.

40.     As such, pursuant to California Health & Safety Code section 25249.7, subparagraph (a), Pac Bell is subject to an injunction ordering Pac Bell to remove the Cables from Lake Tahoe.  Pursuant to California Health & Safety Code section 25249.7, subparagraph (b)(1), Pac Bell is subject to a civil penalty of up to $2,500 for each day of the year preceding the filing of the complaint in this action, and to an additional civil penalty of up to $2,500 per day in the future until Pac Bell stops releasing lead into the waters of Lake Tahoe.

## VI.     RELIEF REQUESTED

Wherefore, CSPA respectfully requests that this Court grant the following relief:

a.     Declare Pac Bell to have violated and to be in violation of 42 U.S.C. § 6972(a)(1)(B);

b.     Enjoin Pac Bell from further and continuing disposal of the Cables where the Cables are in contact with the waters of Lake Tahoe;

c.     Enjoin Pac Bell from further and continuing release of lead from the Cables into the waters of Lake Tahoe;

d.     Order Defendants to pay civil penalties of $2,500 per day beginning one year before the filing of this complaint and continuing until Pac Bell no longer causes lead to be released from the Cables into the waters of Lake Tahoe;

e.     Award Plaintiff's costs and fees (including reasonable attorney, witness, and consultant fees) as authorized by RCRA and California Code of Civil Procedure section 1021.5; and,

f.     Award any such other and further relief as this Court may deem appropriate.

1   Dated: August 20, 2021                    Respectfully Submitted,

2                                             LAW OFFICES OF ANDREW L. PACKARD

3                                             By: /s/ William N. Carlon

4                                                     William N. Carlon
                                                      Attorney for Plaintiff
5                                                     CALIFORNIA SPORT FISHING
                                                      PROTECTION ALLIANCE
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**



August 6, 2020

Ken DaRosa, Acting Director
California Department of
Resources, Recycling and
Recovery
1001 "I" Street
Sacramento, CA 94814

Rhonda J. Johnson, CEO
Pacific Bell Telephone
Company
430 Bush Street
San Francisco, CA 94108

Proposition 65 Enforcement
Reporting
Attention Prop 65 Coordinator
1515 Clay St., Suite 2000
Oakland, CA 94612

Andrew R. Wheeler,
Administrator
U.S. EPA
1200 Pennsylvania Ave, N.W.
Washington, D.C. 20460

John Busterud, Regional
Administrator
U.S. EPA, Region 9
75 Hawthorne Street
San Francisco, CA 94105

CT Corporation System
Registered Agent for
Pacific Bell Telephone Company
818 West Seventh St., Ste 930
Los Angeles, CA 90017

District Attorney
El Dorado County
778 Pacific Street
Placerville, CA 95667

Douglas A. Cannon, CEO
Sierra Pacific Power Company
6100 Neil Road
Reno, NV 89511

Corpservices Company
Registered Agent for
Sierra Pacific Power Company
8301 Florence Ave, #201
Downey, CA 90240

District Attorney
Placer County
10810 Justice Center Dr.,
#240
Roseville, CA 94678

Ian Robertson, CEO
Liberty Utilities (CalPeco
Electric) LLC
345 Davis Rd. Suite 100
Oakville L6J 2X1
ON, Canada

CT Corporation System
Registered Agent for Liberty
Utilities (CalPeco Electric) LLC
818 West Seventh St. Ste 930
Los Angeles, CA 90017

BY CERTIFIED MAIL
RETURN RECEIPT REQUESTED

> **Re:**  **Notice of Violations of Federal Law and Notice of Intent to Begin Citizen**
> **Enforcement Action**

Greetings:

    I write on behalf of the California Sportfishing Protection Alliance (hereinafter, "CSPA")
to notify you of violations of federal and California law caused by four submerged cables (the

"Cables") that lie abandoned in Lake Tahoe's Emerald Bay and along the west shore of Lake Tahoe. Three of these Cables are submarine telecommunications cables; the other is a submarine power cable. Lake Tahoe is located in the California counties of Placer and El Dorado. These violations have been, and are continuing to be, committed by the "Noticed Parties" described in Section II, below, and, more fully, as the private entities in the attached Service List.

CSPA has conducted an investigation of the Cables, including having divers swim above them and photograph them, to determine the extent to which they discharge lead into Lake Tahoe. Lake Tahoe is an existing source of domestic and municipal drinking water. The Cables vary in size and length with three of them, two telecommunications and one power, crossing along the bottom near the mouth of Emerald Bay, and another one approximately five and a half miles traveling along the west shore of the lake. All of the Cables are damaged and discharging lead into Lake Tahoe.

The Cables are as follows:

**Cable A**.

Cable A is approximately 2000 feet long, submerged in Emerald Bay. The latitude and longitudinal coordinates for the southern endpoint is 38.96421504N -120.08144917W and 38.96482016N -120.08359610W for the northern endpoint. A visual inspection shows that Cable A is a submarine telecommunications type with an outer layer of jute impregnated with bitumens/tar, which covers steel rods that protect the interior of Cable A. Under the steel rods is a thick lead sheath that surrounds strands of copper wrapped in paper. This cable has been cut at both ends. An analysis of the piece of the cut end of Cable A reveals that the Cable contains per foot, 3.39 pounds of lead, 4.15 pounds of steel, 0.71 pounds of petroleum-based tar-impregnated jute and 0.77 pounds of copper. Accordingly, in its 2,000-foot length, Cable A contains approximately 6,780 pounds of lead. A visual inspection of Cable A reveals that not only is the Cable cut at one end, so obviously it is not in working condition, but the Cable is damaged at various places along its length, by boat anchors and in other ways, such that, in these damaged portions, the tar-impregnated jute covering no longer prevents water intrusion into the interior of the Cable.

**Cable B.**

Cable B is approximately five and a half miles long. It is submerged along the west shore of Lake Tahoe with the latitude and longitudinal coordinates for the southern end point of 38.94396945N -120.06913414W and 39.00944887N -120.11311122W for the northern endpoint. Cable B appears on close visual inspection to be of the same size, type and character as Cable A. At various points along its more than 5.5-mile length, Cable B has been damaged by boat anchors and has frayed on submerged rocks to the point that the lead sheath is directly exposed

to lake water. Based on an estimated 3.39 pounds per foot, the submerged portion of Cable B contains approximately 89,500 pounds of lead.

**Cable C.**

Cable C is approximately 2,000 feet long and submerged in Emerald Bay with latitude and longitudinal coordinates of 38.96105015N -120.08387085W for the southern end point and 38.96478251N -120.09067881W for the northern endpoint. A close visual inspection reveals that the Cable is a telecommunication cable of a submarine type. At various points it has been damaged by boat anchors and has frayed on submerged rocks to the point that the lead sheath is directly exposed to lake water. It appears to be unworkable and abandoned. Cable C is smaller in diameter than Cable A or Cable B. Nevertheless, it is estimated that the submerged portion of Cable C contains thousands of pounds of lead.

**Cable D.**

Cable D is approximately 2,000 feet long and submerged in Emerald Bay with latitude and longitudinal coordinates for the southern end point of 38.96125614N -120.08451815W and 38.96439289N -120.09007347W for the northern endpoint. A close visual inspection of Cable D reveals that it is a power cable and it is cut at both ends with the ends pulled away from the shore and left in deeper water. The GPS coordinates for the northern cut-end are 38.964735N -120.09058444W. The cable is also severely damaged at several places along its length and, thus, is no longer being used. Cable D is a submarine power cable with a lead sheath surrounding the inner core of copper wire. The Cable is approximately the same diameter as Cables A and B. Based upon this and visual inspection of Cable D, it is estimated that Cable D also contains approximately 3.39 pounds of lead per foot. Accordingly, it is estimated that the submerged portion of Cable D contains 6,780 pounds of lead.

CSPA submerged a sample of Cable A in a plastic container filled with Lake Tahoe water. After 24 hours, a sample was taken of the water and sent to a state-certified laboratory for analysis, which showed that enough lead had leached from the piece of the Cable to bring the concentration of lead in the water to 650 micrograms per liter. After seven days, another sample of the water was taken and sent to the same laboratory for analysis, which showed that the concentration of lead in the water had risen to 1,500 micrograms per liter. This is evidence that lead is leaching from the Cables into Lake Tahoe. Since the Cables have similar composition, based on these findings, it is reasonable to infer that they are all presently discharging lead into Lake Tahoe well beyond established limits for safety.

Lead is a substance that causes neurodevelopmental toxicity, reproductive toxicity (including sterility and delayed onset of puberty in females) and cancer in humans and other animals. Lead is known, pursuant to 27 Cal. Code Regs. section 27001, subsections (b) and (c), to cause cancer developmental and reproductive toxicity in both males and females. This letter

begins the process by which CSPA will seek available remedies under the federal Resource Conservation and Recovery Act ("RCRA") and California's Safe Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65"). CSPA will pursue these remedies to have the abandoned/discarded Cables removed from Lake Tahoe and disposed of in a way that they may no longer pose an imminent danger of substantial harm to human health, the health of other animals and the environment. Removal will prevent the ongoing discharge and release of lead into the waters of Lake Tahoe, a source of drinking water. CSPA will further seek civil penalties for Proposition 65 violations.

I.      **The Noticing Party**

CSPA is a non-profit association dedicated to the preservation, protection and defense of the environment, wildlife and natural resources of California waters, including the waters of Lake Tahoe. CSPA's main office is at 3536 Rainier Avenue, Stockton, California, 95204. CSPA's telephone number is (530) 464-5067. In addition to other California counties, members of CSPA reside in Placer and El Dorado Counties. CSPA members utilize the waters of Lake Tahoe for recreation and work in, on and around Lake Tahoe. Members of CSPA drink water that comes from Lake Tahoe.

II.     **The Noticed Parties**

Pacific Bell Telephone Company ("Pac Bell" or "Noticed Party") is a corporation that provides telecommunication services in California. Pac Bell at one time had the telecommunications Cables A, B and C (including their lead components) installed in Lake Tahoe. Pac Bell owned and operated the Cables A, B and C as part of its business providing telecommunication services. Cables A, B and C are no longer used. Pac Bell abandoned the Cables A, B and C in place on the bottom of Lake Tahoe and had at least one of these Cables cut at both ends in Lake Tahoe as part of that abandonment. For each of these three Cables, this Notice pertains to the Cables themselves, their lead sheathing, and the lead that dissolves off the sheathing and is discharged and released into the water of Lake Tahoe. Pac Bell is in violation of the Resource Conservation and Recovery Act ("RCRA") and the discharge to drinking water provisions of Proposition 65.

Sierra Pacific Power Company ("NV Energy" or "Noticed Party") provides electrical power to consumers in East Central California and Nevada. As part of its electrical utility service, Sierra Pacific Power Company owned and operated Cable D, and had it installed in Lake Tahoe. Later it had both ends of the cable cut and moved to a deeper portion of Emerald Bay where they could not be as easily seen. In this manner, Sierra Pacific abandoned/discarded/disposed of the cable leaving it to leach lead into Emerald Bay. This Notice pertains to Cable D itself, its lead sheathing, and the lead that dissolves off the sheathing and is discharged and released into the water of Lake Tahoe. NV Energy is in violation of the RCRA and the discharge to drinking water provisions of Proposition 65.

Liberty Utilities (CalPeco Electric), LLC is an electric utility company. In 2011, NV Energy assigned its lease for Cable D to California Pacific Electric Company, LLC ("CalPeco Electric"). CalPeco Electric was acquired by Liberty Utilities, LLC in 2012 and is now named, Liberty Utilities (CalPeco Electric), LLC (a "Noticed Party"). As part of its business of holding the lease from the State Lands Commission for Cable D, Liberty Utilities, LLC is thus responsible for the abandonment and discard of Cable D on the bottom of Lake Tahoe, is continuing its abandonment of Cable D on the bottom of Lake Tahoe, and continues to discharge and release lead from Cable D into Lake Tahoe waters. Liberty Utilities (CalPeco Electric) has been doing so each day for at least the past five years and will continue to do so each day into the future until Cable D is removed from the bottom of LakeTahoe is disposed of properly. Liberty Utilities (CalPeco Electric), LLC is in violation of the RCRA and the discharge to drinking water provisions of Proposition 65.

## III.      **Factual Background: The Problem with Abandoning the Cables in Lake Tahoe**

As discussed above, the submerged Cables have been cut or damaged, which has allowed water to intrude into the Cables. In addition, inspection of the submerged part of the Cables shows that as part of the damage to the Cables, sections of the tar-impregnated jute have virtually disappeared, leaving the steel protective rods exposed, and in some places severed. This means that in sections of the Cables that have been damaged in this way, lake water intrudes into the Cables and contacts the lead sheathing. It has been shown that when Lake Tahoe water contacts the lead sheathing in the Cable, the water dissolves lead from the sheathing. This lead-laden water then mingles with the larger body of Lake Tahoe water, polluting it with lead. Because the Noticed Parties have discarded/abandoned and disposed of the Cables in the manner they have, the Cables continuously discharge and release lead – a toxic heavy metal – into the local aquatic environment, which is a source of drinking water within the meaning of California Health & Safety Code section 25249.5.

The disposal and abandonment of the Cables in Lake Tahoe, and the subsequent and continuing discharge of lead from the Cables into Lake Tahoe poses a significant threat to the health of persons and to the local environment, including fish and wildlife. Not only is lead toxic to humans, it is also toxic to birds, fish and mammals. Numerous members of the public are exposed daily to lead from the Cables when they swim, boat and dive in Lake Tahoe and when they drink water drawn from Lake Tahoe, or eat fish caught in Lake Tahoe. The lead also increases the body burdens of lead in the fish, birds and mammals that live in or on Lake Tahoe and/or feed on prey that live in or on Lake Tahoe. These increased lead body burdens cumulatively subject humans and animals to significant health risks.

## IV. Specific Permits, Standards, Regulations, Conditions, Requirements or Orders Violated

### A. RCRA Standard Violated

With regard to RCRA, this Notice pertains to the Noticed Parties' violations of 42 U.S.C. § 6972(a)(1)(B), which provides that:

> Any person may commence a civil action on his own behalf – against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

For purposes of RCRA, the Noticed Parties have contributed and are contributing to the past, present and future storage and disposal of solid waste, to wit the Cables and their lead sheathing, in a way that may present an imminent and substantial endangerment to health and the environment.

### B. Provisions of Proposition 65 that are Being Violated

With regard to Proposition 65, this Notice pertains to the Noticed Parties' violations of Cal. Health & Saf. Code § 25249.5, which provides that:

> No person in the course of doing business shall knowingly discharge or release a chemical known to the state to cause cancer or reproductive toxicity into water or onto or into land where such chemical passes or probably will pass into any source of drinking water, notwithstanding any other provision or authorization of law except as provided in Section 25249.9.

The Noticed Parties cut the Cables and abandoned them, and left damaged Cables in Lake Tahoe. They did this as part of their business selling telecommunication services and electrical utility service in California and Nevada. As the Cables sit abandoned on the bottom of Lake Tahoe, they continuously discharge and release lead – a chemical known to the State of California to cause cancer and reproductive toxicity – into the waters of Lake Tahoe. Each Noticed Party employs ten or more persons and is thus a "person in the course of business" for purposes of California Health & Safety Code section 25249.11(b).

Pursuant to the Basin Plan for the Lahontan Region, Lake Tahoe has been designated an existing source of domestic and municipal water supply. As such, Lake Tahoe is a source of

drinking water within the meaning of California Health & Safety Code section 25249.11(d). The Noticed Parties' business practice of leaving the Cables abandoned on the bottom of Lake Tahoe is thus a continuous violation of California Health & Safety Code section 25249.5 because the Cables continuously discharge and release lead into Lake Tahoe waters.

### C.    The Activity that Constitutes the Violations

This notice of intention to file a citizen suit pertains to the Cables, which lie discarded, abandoned and disposed of on the bottom of Lake Tahoe in Placer and El Dorado Counties, California. The Cables continuously discharge and release lead into the waters of Lake Tahoe. Humans and wildlife utilize Lake Tahoe and, in doing so, are exposed to the lead that the abandoned Cables discharge and release into the waters of Lake Tahoe.

Lead has long been known to be a potent neurotoxin. There is an extensive toxicological literature that demonstrates that exposure to lead causes sterility in male humans and other mammals. There is an extensive toxicological literature that demonstrates that exposure to lead delays the onset of puberty in female humans and other mammals. Exposure to lead has been shown to kill aquatic bird life. Lead is toxic to fish and, basically, any animal that has a central nervous system. There is an extensive toxicological literature that demonstrates that pre-natal exposure to lead impairs the development of the central nervous systems of humans and other animals. Lead does this at levels of exposure as low as can be measured. Lead's toxic effect on the developing nervous system does so according to a supralinear curve, which means that lower levels of exposure do proportionately more harm to the developing nervous system than higher levels of exposure. There is an extensive toxicological literature that demonstrates that for each one microgram per deciliter rise in the concentration of lead in blood of a human between conception and six years of age, there is a corresponding loss of approximately one IQ point. There is no level of exposure to lead known to science that does not cause harm to humans and other animals.

## V.    The Persons Responsible for Violating RCRA and Proposition 65

The Noticed Parties are each responsible for violating RCRA and Proposition 65 as further described in this letter.

### A.    Dates of Violation of RCRA, 42 U.S.C. § 6972(a)(1)(B)

Lead has been discharged and released from the lead sheathing of the Cables into the waters of Lake Tahoe every day since the Noticed Parties cut the Cables and abandoned them on the bottom of Lake Tahoe and left them damaged on the bottom knowing they were damaged. Lead will continue to be discharged and released from the lead sheathing of the Cables into the waters of Lake Tahoe, thus presenting an imminent and substantial endangerment to health and the environment that has occurred every day for at least the past five years and will continue every day into the future until the Noticed Parties remove the Cables from Lake Tahoe and properly dispose of them. Accordingly, the Noticed Parties have been violating this RCRA

provision continuously for at least the past five years. Thus, the dates of violation to which this Notice pertains are each and every single day dating back at least five years from the date of this letter and continuing each day into the future until the abandoned Cables have been removed from Lake Tahoe and disposed of in a responsible manner.

### B. Dates of Violation of Proposition 65

The Cables have discharged and released lead into the waters of Lake Tahoe every day for at least the past year preceding the date of this Notice letter. The Cables will all continue to discharge and release lead into the waters of Lake Tahoe each and every day into the future until the Noticed Parties remove the Cables from Lake Tahoe and properly dispose of them. The dates of violation of Health and Safety Code section 25249.5 are each day over at least the past year, plus every day into the future until the abandoned Cables have been removed from Lake Tahoe.

### VI. Full Name, Address and Telephone Number of the Person Giving Notice

The full name, address and telephone number of the person providing this Notice is:

Bill Jennings, Executive Director
California Sportfishing Protection Alliance
3536 Rainer Avenue
Stockton, CA 95204
(209) 464-5067

### VII. Name, Address and Telephone Numbers of Noticing Party's Counsel

William Verick
Klamath Environmental Law Center
1125 16th Street, Suite 204
Arcata, CA 95521
(707) 630-5061

Brian Acree
Law Offices of Brian Acree
331 "J" Street, Suite 200
Sacramento, CA 95814
(916) 505-6861

Andrew Packard
William Carlon
Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952
(707) 782-4060

Kirk Boyd
Law Offices of Kirk Boyd
548 Market Street, Suite 1300
San Francisco, CA 94104
(415) 440-2500

CSPA would be happy to discuss effective remedies for the violations referenced in this Notice. If you wish to pursue such discussions in the absence of litigation, we suggest that you initiate these discussions immediately so that a resolution may be reached before the end of the

60-day notice period (for the Proposition 65 violations alleged here) and 90-day notice period (for the RCRA violations alleged here).  Please contact counsel if you have any questions or would like more information

        Cordially,

William Verick

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE<br><br>     *Plaintiff*<br><br>   v.<br><br>PACIFIC BELL TELEPHONE COMPANY<br><br>     *Defendant* | Civil Action No.:  2:21-CV-00073-MCE-JDP |

**NON-PARTY ENVIRONMENTAL DEFENSE FUND'S RESPONSES AND OBJECTIONS TO THE SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION**

Third party Environmental Defense Fund ("EDF"), by and through undersigned counsel, hereby responds and objects to the subpoena (the "Subpoena") served upon it on August 8, 2023 by Defendant Pacific Bell Telephone Company ("Pacific Bell" or "Defendant").

**GENERAL OBJECTIONS**

1.  EDF objects to the Subpoena to the extent that it seeks to impose obligations that exceed the scope of, or are inconsistent with, the requirements of the Federal Rules of Civil Procedure or any orders of this Court.

2.  EDF objects to the Subpoena on the basis that it seeks to impose obligations on a third party that are unduly burdensome, unnecessary and unreasonably expensive.  EDF is a non-profit organization that is entrusted with donor dollars and operates for the public good. Many of the document requests contained in the Subpoena are vague, ambiguous, unreasonably broad and confusing, such that even attempting to search for responsive documents would place an undue and unreasonable burden on EDF's financial and human resources.

3.      EDF objects to the Subpoena based on a good faith belief that it is overbroad and seeks information that is not relevant to any party's claim or defense, nor proportional to the needs of the case. The operative Second Amended Complaint (the "Complaint") was filed on August 20, 2021. The subject matter of the Complaint is environmental contamination attributable to two submarine telecommunications cables that traverse(d) portions of Lake Tahoe, and which apparently were owned and/or operated by Pacific Bell but are no longer operative. (Complaint ¶ 5.) The Complaint does not reference any other cables or locations, nor does it mention EDF or non-parties Marine Taxonomic Services, Ltd and the Wall Street Journal.

4.      EDF objects to the Subpoena to the extent that the terms used therein are vague, undefined and/or ambiguous, and that such terms assume facts not within EDF's knowledge.

5.      EDF objects to the Subpoena to the extent that it seeks information that is unreasonably cumulative or duplicative of other discovery requests, or that may be obtained from some other source that is more convenient, less burdensome and less expensive.

6.      EDF objects to the Subpoena to the extent that it seeks documents and/or information already known to Defendant or available to Defendant in its own files or from public sources.

7.      EDF objects to the Subpoena on the basis that it does not allow a reasonable time to comply. The Subpoena was served on August 8, 2023, and it purports to require a document production within 14 days.  Pacific Bell agreed to extend the response period to 30 days following service, but even that is insufficient in light of the breadth of the Subpoena's requests.

8.      EDF objects to the Subpoena to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product doctrine, a public reporting privilege and/or any other applicable privilege or immunity.  Nothing herein is intended to be, or in any way

2

constitutes, a waiver of any applicable privilege or immunity.

9.    EDF objects to the Subpoena to the extent that it is not delimited in temporal scope, and thus purports to require the preservation, collection, review and production of records from the beginning of time until the present.  In this respect, the Subpoena is unnecessarily and unreasonably overbroad and seeks information and documents that are not relevant to any claim or defense.

10.    EDF objects to the Subpoena to the extent it seeks information that is not reasonably accessible to EDF, or within EDF's possession, custody or control.

11.    If EDF is required to respond to the Subpoena, Pacific Bell should be required to reimburse EDF for its time and effort necessary to respond, including the costs of preservation, collection, review and production.

12.    To the extent Pacific Bell persists in its effort to obtain discovery from EDF notwithstanding EDF's objections herein, EDF is prepared to discuss its objections in the context of a mutually convenient meet-and-confer discussion.

## SPECIFIC OBJECTIONS AND RESPONSES

**Request No. 1:**  All Documents and Communications, including pictures and videos, concerning any sections of lead-clad cables removed from Lake Tahoe by You or other persons acting on Your behalf, including but not limited to Marine Taxonomic Services, Ltd., Seth Jones, and Monique Rydel Fortner.

**Objections and Response:**    EDF reasserts and incorporates by reference each of its General Objections. EDF objects to this Request seeking "All Documents and Communications" as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. This Request fails the proportionality test under Rule 26(b) in part because it is not limited to a particular time period that is relevant to the contested issues. Further, this

3

Request is unduly burdensome because it is not limited to documents that are relevant to this instant action.

EDF is a third-party public interest organization, and while data concerning the two submarine cables at issue may be relevant to this lawsuit, EDF's communications about those (or other) cables are not relevant; in this respect, the Subpoena is overbroad, unduly burdensome, and plainly intended to harass and intimidate EDF into not pursuing its core mission of environmental protection.

Subject to and without waiving the foregoing and its General Objections, EDF responds as follows: EDF will produce non-privileged documents responsive to this Request that are in its current possession, custody, or control and relevant and/or proportional to the needs of the case – if any exist. This production will include data potentially related to the two submarine cables at issue in this lawsuit, and documents describing the terms and condition of EDF's relationship with Marine Taxonomic Services Ltd. ("MTS"), Seth Jones, and Monique Rydel Fortner.

**Request No. 2:** All Documents and Communications concerning or discussing permits requested or obtained by You or other persons acting on Your behalf, including but not limited to Marine Taxonomic Services, Ltd., Seth Jones, and Monique Rydel Fortner, to test, cut or remove any sections of lead-clad cables in or from Lake Tahoe.

**Objections and Response:** EDF reasserts and incorporates by reference each of its General Objections. EDF objects to this Request seeking "All Documents and Communications" as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. This Request fails the proportionality test under Rule 26(b) in part because it is not limited to a particular time period that is relevant to the contested issues. EDF also objects to this Request to the extent that the term "permits" used herein is vague, undefined and/or ambiguous, and assumes facts not within EDF's knowledge. Further, this Request is unduly burdensome because it is not limited to documents that are relevant to this instant action.

4

EDF is a third-party public interest organization, and while data concerning the two submarine cables at issue may be relevant to this lawsuit, documents and communications reflecting or discussing permits "to test, cut or remove any sections of [such] cables" – to the extent any exist – are not relevant; in this respect, the Subpoena is overbroad, unduly burdensome, and plainly intended to harass and intimidate EDF into not pursuing its core mission of environmental protection.

Subject to and without waiving the foregoing and its General Objections, EDF responds as follows: EDF will produce non-privileged documents responsive to this Request that are in its current possession, custody, or control and relevant and/or proportional to the needs of the case – if any exist.  This production will include any permits "to test, cut or remove" lead-conduit cable from Lake Tahoe, whether or not obtained by or at the request of EDF, if any exist within EDF's possession, custody or control.

**Request No. 3:**  All Documents and Communications, including but not limited to any pictures, videos, or test results, relating to any "kiddie pool" used by You or others acting on Your behalf, including but not limited to Marine Taxonomic Services, Ltd., Seth Jones, and Monique Rydel Fortner, to test lead-clad cables removed from Lake Tahoe or elsewhere.

**Objections and Response:**  EDF reasserts and incorporates by reference each of its General Objections. EDF objects to this Request seeking "All Documents and Communications" as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. EDF additionally objects to this Request to the extent that the term "kiddie pool" used herein is vague, undefined and/or ambiguous, and assumes facts not within EDF's knowledge. This Request fails the proportionality test under Rule 26(b) in part because it is not limited to a particular time period that is relevant to the contested issues. Further, this Request is unduly burdensome because it is not limited to documents that are relevant to this instant action.

EDF is a third-party public interest organization, and while data concerning the two submarine cables at issue may be relevant to this lawsuit, it is unclear what relevance an undefined "kiddie pool" might have; in this respect, the Subpoena is overbroad, unduly burdensome, and plainly intended to harass and intimidate EDF into not pursuing its core mission of environmental protection.

Subject to and without waiving the foregoing and its General Objections, EDF responds as follows: EDF will produce non-privileged documents responsive to this Request that are in its current possession, custody, or control and relevant and/or proportional to the needs of the case – if any exist.

**Request No. 4:**  All Documents related to the experience or qualifications of Marine Taxonomic Services, Ltd., Below the Blue, Seth Jones, or Monique Rydel Fortner to perform sampling, testing, or analysis of lead-clad cables in water, soil, or aerial environments.

**Objections and Response:**    EDF reasserts and incorporates by reference each of its General Objections. EDF objects to this Request seeking "All Documents" as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Further, this Request is unduly burdensome because it is not limited to documents that are relevant to this instant action. EDF also objects to this Request because the information is readily available from another source. EDF is not a party to this action. Any documents related to the "experience or qualifications of Marine Taxonomic Services, Ltd., Below the Blue, Seth Jones, or Monique Rydel Fortner to perform sampling, testing, or analysis of lead-clad cables in water, soil, or aerial environments" can be more readily obtained from those entities directly.

Subject to and without waiving the foregoing and its General Objections, EDF responds as follows: To the extent EDF has within its current possession, custody or control any non-privileged documents that were provided to it by Marine Taxonomic Services, Ltd., Below the Blue, Seth

Jones, or Monique Rydel Fortner for the purpose of educating EDF on any of their professional qualifications and experience, EDF will produce such documents.

**Request No. 5:**  All Documents and Communications concerning the Marine Taxonomic Services and Below the Blue Lead Cable Investigation Report, available at https:/ /belowtheblue.org/edf-report (the "EDF Report").

    <u>**Objections and Response:**</u>  EDF reasserts and incorporates by reference each of its General Objections. EDF objects to this Request seeking "All Documents and Communications" as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

    EDF is a third-party public interest organization, and the subject matter of the so-called "EDF Report" is core to its mission; the request that EDF produce not only that document (which the Subpoena acknowledges is available to the public on the internet), but also "[a]ll Documents and Communications *concerning*" that document (emphasis added) is overbroad, unduly burdensome, and plainly intended to harass and intimidate EDF into not pursuing its core mission of environmental protection.  Although some data contained in the "EDF Report" may be relevant to this lawsuit, whatever EDF may have said, thought or done concerning that Report is not relevant.  This Request also is unduly burdensome because it is not limited to documents that are relevant to this instant action.

    Subject to and without waiving the foregoing and its General Objections, EDF responds as follows: EDF will produce a copy of the so-called "EDF Report" in response to the Subpoena, notwithstanding that it is available to the public on the internet.

**Request No. 6:**  All Documents and Communications concerning the method by which sampling locations were selected at Lake Tahoe or other locations referenced in the WSJ Articles, including Documents and Communications relating to the statement in the EDF Report that "[s]ampling locations were chosen in part by their likelihood to show high lead levels."

**Objections and Response:**   EDF reasserts and incorporates by reference each of its General Objections. EDF objects to this Request seeking "All Documents and Communications" as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. EDF further objects to this Request to the extent that the term "sampling locations" used herein is vague, undefined and/or ambiguous, and assumes facts not within EDF's knowledge. This Request fails the proportionality test under Rule 26(b) in part because it is not limited to a particular time period that is relevant to the contested issues. Further, this Request is unduly burdensome because it is not limited to documents that are relevant to this instant action to the extent that the Request relates to "other locations."

EDF is a third-party public interest organization, and while data concerning the two submarine cables at issue may be relevant to this lawsuit, documents and communications concerning the method by which other third parties may have determined sampling locations in Lake Tahoe or elsewhere are not relevant and discoverable from EDF; in this respect, the Subpoena is overbroad, unduly burdensome, and plainly intended to harass and intimidate EDF into not pursuing its core mission of environmental protection.

Subject to and without waiving the foregoing and its General Objections, EDF responds as follows: EDF will produce non-privileged documents responsive to this Request that are in its current possession, custody, or control and relevant and/or proportional to the needs of the case – if any exist.  This production will include documents and communications that describe the manner in which sampling locations in Lake Tahoe were selected, if any exist.

**Request No. 7:**  All Documents related to and Communications between You and any party described or otherwise referenced in the WSJ Articles, or Plaintiff or Plaintiff's counsel in the Lawsuit, concerning or discussing the WSJ Articles, the WSJ Investigation, any testing or analysis of lead-clad cables (including any draft reports) or the Lawsuit, including but not limited to Marine Taxonomic Services, Ltd., Wall Street Journal, Pace Analytical Services, Environmental Systems Research Institute, MCH Strategic Data, Quest Diagnostics, Pure Earth; Environmental Council

8

of the State, Altec Testing & Engineering, Inc., RTI International, ALTA Environmental Corporation, Seth Jones, Monique Fortner, Jack Caravanos, Tom Neltner, Ben Grumbels, Bruce Nelson, Bryan Stolte, Jennifer Redmon, Braden Allenby, Gordon Binkhorst, James Winn, Dr. Phillip Landrigan, or any "environmental researchers."

**Objections and Response:**    EDF reasserts and incorporates by reference each of its General Objections. EDF objects to this Request seeking "All Documents related to and Communications" as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. This Request is unduly burdensome and fails the proportionality test under Rule 26(b) in part because it is not limited to a particular time period that is relevant to the contested issues, but also because it is not limited to communications with, or even concerning, the parties to this lawsuit and the issues in dispute.

EDF also objects to this Request because some of the information sought is available from another source that is a party to this action. EDF is not a party to this action. Any communications between EDF and Plaintiff California Sport Fishing Alliance can be more readily obtained from such entity itself – California Sport Fishing Alliance, the Plaintiff in this action.

Finally, EDF objects to this Request because it is overbroad and unduly burdensome in that it seeks documents that are protected from disclosure by the attorney-client privilege or the attorney work-product doctrine and/or a public interest reporting privilege.

EDF is a third-party public interest organization, and while data concerning the two submarine cables at issue may be relevant to this lawsuit, EDF's documents and communications concerning lead-clad cables – either generally or specifically – is not relevant.  In this respect, the Subpoena is overbroad, unduly burdensome, and plainly intended to harass and intimidate EDF into not pursuing its core mission of environmental protection.

Subject to and without waiving the foregoing and its General Objections, EDF responds as follows: EDF will produce the data that underlies the so-called "EDF Report."

9

**Request No. 8:**  All invoices for work performed relating to the Lawsuit, the WSJ Articles, the WSJ Investigation, or lead-clad cables, including but not limited to work performed for any individuals or entities listed in Request No. 7.

**Objections and Response:**  EDF reasserts and incorporates by reference each of its General Objections. EDF objects to this Request seeking "All invoices relating to the Lawsuit, the WSJ Articles, the WSJ Investigation, or lead-clad cables" as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. This Request is unduly burdensome and fails the proportionality test under Rule 26(b) in part because it is not limited to a particular time period that is relevant to the contested issues, but also because it is not limited to invoices related to the parties to this lawsuit and the issues in dispute. Finally, EDF objects to this Request because it is overbroad and unduly burdensome in that it seeks documents that are protected from disclosure by the attorney-client privilege or the attorney work-product doctrine, and in that it seeks documents that are available from another source that is a party to this litigation.

EDF is a third-party public interest organization, and while data concerning the two submarine cables at issue may be relevant to this lawsuit, EDF's "invoices for work performed relating to" a multitude of subjects, including "lead-clad cables" generally, is not relevant.  In this respect, the Subpoena is overbroad, unduly burdensome, and plainly intended to harass and intimidate EDF into not pursuing its core mission of environmental protection.

Subject to and without waiving the foregoing and its General Objections, EDF responds as follows: EDF will produce non-privileged documents responsive to this Request in its current possession, custody, or control that are relevant and/or proportional to the needs of the case.  This production will include invoices submitted between EDF and MTS.

**Request No. 9:**  All Documents and Communications concerning or discussing the Lawsuit, the WSJ Investigation, the WSJ Articles, or lead-clad cables at Lake Tahoe or elsewhere, including research, sampling, testing, data, analysis, drafts, reports, or Studies.

**Objections and Response:** EDF reasserts and incorporates by reference each of its General Objections. EDF objects to this Request seeking "All Documents and Communications" concerning or discussing lead-cables anywhere in the world as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. This Request is unduly burdensome and fails the proportionality test under Rule 26(b) in part because it is not limited to a particular time period that is relevant to the contested issues, but also because it is not limited to lead-cables related to the parties to this lawsuit and the issues in dispute.

EDF objects to this Request because it is overbroad and unduly burdensome in that it seeks documents that are protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or a public interest reporting privilege, and in that it seeks documents that are available from another source that is a party to this litigation.

EDF is a third-party public interest organization, and while data concerning the two submarine cables at issue may be relevant to this lawsuit, EDF's "Documents and Communications" relating to a multitude of subjects, including "lead-clad cables" generally, is not relevant. In this respect, the Subpoena is overbroad, unduly burdensome, and plainly intended to harass and intimidate EDF into not pursuing its core mission of environmental protection.

Subject to and without waiving the foregoing and its General Objections, EDF responds as follows: EDF will produce the data that underlies the so-called "EDF Report."

**Request No. 10:** All Documents and Communications concerning or discussing any agreement between You and any party relating to the Lawsuit, the WSJ Articles, the WSJ Investigation, or lead clad cables, including Plaintiff or any of Plaintiff's counsel in the Lawsuit and any individuals or entities listed in Request No. 7.

**Objections and Response:** EDF reasserts and incorporates by reference each of its General Objections. EDF objects to this Request seeking "All Documents and Communications" concerning or discussing "any agreement" as overly broad, unduly burdensome and not reasonably

11

calculated to lead to the discovery of admissible evidence. This Request is unduly burdensome and

fails the proportionality test under Rule 26(b) in part because it is not limited to a particular time

period that is relevant to the contested issues, but also because it is not limited to the issues and

parties in suit; instead, this Request asks EDF to produce a broad swath of documents and

communications with *any party*, concerning a matter of public concern.  In this respect, the Request

is nearly unbounded.

EDF is a third-party public interest organization, and while data concerning the two

submarine cables at issue may be relevant to this lawsuit, EDF's "Documents and Communications"

relating to a multitude of subjects, including "lead-clad cables" generally, is not relevant.  In this

respect, the Subpoena is overbroad, unduly burdensome, and plainly intended to harass and

intimidate EDF into not pursuing its core mission of environmental protection.

EDF also objects to this Request because it seeks communications that can be more readily

obtained from California Sport Fishing Alliance, the Plaintiff in this action. Finally, EDF objects

to this Request because it is overbroad and unduly burdensome in that it seeks documents that are

protected from disclosure by the attorney-client privilege, the attorney work-product doctrine

and/or a public interest reporting privilege.

Subject to and without waiving the foregoing and its General Objections, EDF responds as

follows: EDF will produce the data that underlies the so-called "EDF Report."

**Request No. 11:**  All Documents and Communications related to any research, sampling, testing,
data, analysis, drafts, reports, or Studies You requested, performed, or collected for or on behalf
of the Wall Street Journal or Plaintiff or Plaintiff's counsel in the Lawsuit, relating to lead, the
WSJ Investigation, Lake Tahoe, or the Lawsuit.

**Objections and Response:**  EDF reasserts and incorporates by reference each of its

General Objections. EDF objects to this Request seeking "All Documents and Communications"

as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of

admissible evidence. This Request is unduly burdensome and fails the proportionality test under Rule 26(b) in part because it is not limited to a particular time period that is relevant to the contested issues, but also because it is not limited to lead-cables related to the parties to this lawsuit and the issues in dispute. EDF also objects to this Request because the information is available from another source that is a party to this action. Any communications between EDF and Plaintiff can be more readily obtained from California Sport Fishing Alliance, the Plaintiff in this action. Finally, EDF objects to this Request because it is overbroad and unduly burdensome in that it seeks documents that are protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or a public interest reporting privilege and in that it seeks documents that are available from another source that is a party to this litigation.

EDF is a third-party public interest organization, and while data concerning the two submarine cables at issue may be relevant to this lawsuit, EDF's other "Documents and Communications" are not. In this respect, the Subpoena is overbroad, unduly burdensome, and plainly intended to harass and intimidate EDF into not pursuing its core mission of environmental protection.

Subject to and without waiving the foregoing and its General Objections, EDF responds as follows: EDF will produce the data that underlies the so-called "EDF Report."

**Request No. 12:**  All Documents or Communications related to statements about AT&T, Inc., any of its subsidiaries, or any current or former telecommunications company referenced in the WSJ Articles.

**Objections and Response:**  EDF reasserts and incorporates by reference each of its General Objections. EDF objects to this Request seeking "All Documents and Communications" as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. This Request is unduly burdensome and fails the proportionality test under Rule 26(b) in part because it is not limited to a particular time period that is relevant to the contested

issues, but also because it is not limited to the parties to this lawsuit and the issues in dispute. Finally, EDF objects to this Request because it is overbroad and unduly burdensome in that it seeks documents that are protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or a public interest reporting privilege and in that it seeks documents that are available from another source that is a party to this litigation.

EDF is a third-party public interest organization, and its "Documents and Communications" sought by this Request are not relevant to this lawsuit. In this respect, the Subpoena is overbroad, unduly burdensome, and plainly intended to harass and intimidate EDF into not pursuing its core mission of environmental protection.

**Request No. 13:** All Documents and Communications exchanged between You and any current or former employee of Defendant or AT&T, Inc. related to lead-clad cables.

**Objections and Response:** EDF reasserts and incorporates by reference each of its General Objections. EDF objects to this Request seeking "All Documents and Communications" as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. This Request is unduly burdensome and fails the proportionality test under Rule 26(b) in part because it is not limited to a particular time period that is relevant to the contested issues, but also because it is not limited to the parties to this lawsuit and the issues in dispute. Finally, EDF objects to this Request because it is overbroad and unduly burdensome in that it seeks documents that are protected from disclosure by the attorney-client privilege or the attorney work-product doctrine, and in that it seeks documents that are available from another source that is a party to this litigation.

EDF is a third-party public interest organization, and its "Documents and Communications" sought by this Request are not relevant to this lawsuit. In this respect, the Subpoena is overbroad,

unduly burdensome, and plainly intended to harass and intimidate EDF into not pursuing its core mission of environmental protection.

**Request No. 14:**  All Communications between You and any federal, state, or local governmental or regulatory agency related to or otherwise referencing the following:

  (i)      the Lawsuit;
  (ii)     the WSJ Articles;
  (iii)    the WSJ Investigation; or
  (iv)    lead-clad cables, including but not limited to their location, potential removal, environmental impact, or health effects.

 **Objections and Response:**  EDF reasserts and incorporates by reference each of its General Objections. EDF objects to this Request seeking "All Communications" as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. This Request is unduly burdensome and fails the proportionality test under Rule 26(b) in part because it is not limited to a particular time period that is relevant to the contested issues, but also because it is not limited to the parties to this lawsuit and the issues in dispute. Finally, EDF objects to this Request because it is overbroad and unduly burdensome in that it seeks documents that are protected from disclosure by the attorney-client privilege or the attorney work-product doctrine, and in that it seeks documents that are available from another source that is a party to this litigation.

 EDF is a third-party public interest organization, and its "Documents and Communications" sought by this Request are not relevant to this lawsuit. In this respect, the Subpoena is overbroad, unduly burdensome, and plainly intended to harass and intimidate EDF into not pursuing its core mission of environmental protection.

**Request No. 15:**  All Documents or writings of any nature You have disseminated to any News Outlet regarding lead-clad cables.

 **Objections and Response:**  EDF reasserts and incorporates by reference each of its General Objections. EDF objects to this Request seeking "All Documents or writings of any nature" as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of

admissible evidence. This Request is unduly burdensome and fails the proportionality test under Rule 26(b) in part because it is not limited to a particular time period that is relevant to the contested issues, but also because it is not limited to the parties to this lawsuit and the issues in dispute. Finally, EDF objects to this Request because it is overbroad and unduly burdensome in that it seeks documents that are protected from disclosure by a public interest reporting privilege.

EDF is a third-party public interest organization, and the materials sought by this Request are not relevant to this lawsuit. In this respect, the Subpoena is overbroad, unduly burdensome, and plainly intended to harass and intimidate EDF into not pursuing its core mission of environmental protection.

**Request No. 16:**  All Documents prepared by You, for the benefit of You, or provided to You concerning any Study, research or investigation on the possible or actual adverse effects of lead-clad cables.

**Objections and Response:**  EDF reasserts and incorporates by reference each of its General Objections. EDF objects to this Request seeking "All Documents" as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. This Request is unduly burdensome and fails the proportionality test under Rule 26(b) in part because it is not limited to a particular time period that is relevant to the contested issues, but also because it is not limited to the parties to this lawsuit and the issues in dispute. Finally, EDF objects to this Request because it is overbroad and unduly burdensome in that it seeks documents that are protected from disclosure by the attorney-client privilege or the attorney work-product doctrine.

EDF is a third-party public interest organization, and the materials sought by this Request are not relevant to this lawsuit. In this respect, the Subpoena is overbroad, unduly burdensome, and plainly intended to harass and intimidate EDF into not pursuing its core mission of environmental protection.

**Request No. 17:** All Documents and Communications relating to Your participation in or funding of any test or Study related to or otherwise concerning lead-clad cables.

    **Objections and Response:** EDF reasserts and incorporates by reference each of its General Objections. EDF objects to this Request seeking "All Documents and Communications" as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. This Request is unduly burdensome and fails the proportionality test under Rule 26(b) in part because it is not limited to a particular time period that is relevant to the contested issues, but also because it is not limited to the parties to this lawsuit and the issues in dispute. Finally, EDF objects to this Request because it is overbroad and unduly burdensome in that it seeks documents that are protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or a public interest reporting privilege.

    EDF is a third-party public interest organization, and the materials sought by this Request are not relevant to this lawsuit. In this respect, the Subpoena is overbroad, unduly burdensome, and plainly intended to harass and intimidate EDF into not pursuing its core mission of environmental protection.

DATED:      September 8, 2023

                            Respectfully submitted,

                            BLANK ROME LLP

                            By: _____
                            ALAN M. FREEMAN (DC Bar No. 454693)
                            1825 Eye Street, NW
                            Washington, D.C.  20006
                            Tel: (202) 772-5925
                            Fax: (202) 572-8370
                            Email:  Alan.Freeman@blankrome.com

                            NAOMI ZWILLENBERG (*of counsel*)
                            One Logan Square
                            Philadelphia, PA 19103

Tel: (215) 569-5500
Fax: (215) 834-5426
Email:  Naomi.Zwillenberg@blankrome.com

*Counsel for Environmental Defense Fund*

## CERTIFICATE OF SERVICE

I, Naomi Zwillenberg, hereby certify that on September 8, 2023, a true and correct copy of

the foregoing was electronically mailed to the following counsel of record:

Navi Singh Dhillon
**PAUL HASTINGS LLP**
101 California Street, 48th Floor
San Francisco, California  94111
Telephone:  (415) 856-7000
Fax: (415) 856-7100
navidhillon@paulhastings.com

Deborah Schmall
**PAUL HASTINGS LLP**
101 California Street, 48th Floor
San Francisco, California  94111
Telephone:  (415) 856-7000
Fax: (415) 856-7100
deborahschmall@paulhastings.com

Peter C. Meier
**PAUL HASTINGS LLP**
101 California Street, 48th Floor
San Francisco, California  94111
Telephone:  (415) 856-7000
Fax: (415) 856-7100
petermeier@paulhastings.com

Lucas Grunbaum
**PAUL HASTINGS LLP**
101 California Street, 48th Floor
San Francisco, California  94111
Telephone:  (415) 856-7000
Fax: (415) 856-7100
lucasgrunbaum@paulhastings.com

Robert B. Ellis
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Fax: (312) 862-2200
robert.ellis@kirkland.com

Hariklia Karis
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, IL 60654
Telephone:  (312) 862-2330
Fax: (312) 862-2200
hariklia.karis@kirkland.com

Mark J. Nomellini
**KIRKLAND & ELLIS LLP**
300 North Lasalle St.
Chicago, IL 60654
Telephone: (312) 861-2410
mark.nomellini@kirkland.com

*Attorneys for Defendant PACIFIC BELL*
*TELEPHONE COMPANY*

Brian Darwin Acree
**LAW OFFICE OF BRIAN ACREE**
331 J St.
Suite 200
Sacramento, CA 85286
Tel: (510) 517-5196
brian@brianacree.com

Andrew L. Packard
**LAW OFFICES OF ANDREW L.**
**PACKARD**
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Tel: (707) 782-4060
Fax: (707) 782-4062
andrew@packardlawoffices.com

William N. Carlon
**LAW OFFICES OF ANDREW L.
PACKARD**
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Tel: (707) 782-4060
Fax: (707) 782-4062
wncarlon@packardlawoffices.com

William Verick
**KLAMATH ENVIRONMENTAL LAW
CENTER**
1125 16th Street, Suite 204
Arcata, CA 95521
Tel: (707) 630-5061
Fax: (707) 630-5064
wverick@igc.org

J. Kirk Boyd
**LAW OFFICE OF JOHN KIRK BOYD**
548 Market St., Suite 1300
San Francisco, CA 94104-5401
Tel: (415) 440-2500
jkb@drjkb.com


*Attorneys for Plaintiff CALIFORNIA
SPORTFISHING PROTECTION
ALLIANCE*


NAOMI ZWILLENBERG (*of counsel*)
One Logan Square
Philadelphia, PA 19103
Tel: (215) 569-5500
Fax: (215) 834-5426
Email: Naomi.Zwillenberg@blankrome.com

CERTIFICATE OF SERVICE